Joseph M. SHEA, George Rapovich, John M. Miller, Raymond J. Gunville, Appellants,

v.

The HANNA MINING COMPANY, Respondent.

Nos. C6–86–470, C8–86–471, CX–86–472 and C1–86–473.

Court of Appeals of Minnesota.

Dec. 9, 1986.

Edward J. Matonich, Matonich & Persson, Hibbing, for appellants.

Richard A. Williams, Jr., Hvass, Weisman & King, Minneapolis, James A. Rydzel, Joseph F. Winterscheid, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for respondent.

Heard, considered, and decided by RANDALL, P.J., and FOLEY and HUSPENI, JJ.

## OPINION

FOLEY, Judge.

This appeal is from an order denying post-trial motions by appellants Joseph M. Shea, George Rapovich, John M. Miller and Raymond J. Gunville for a new trial or amended findings. In August 1982, appellants brought four separate actions alleging that respondent Hanna Mining Company had discriminated against them on the basis of age in violation of Minn.Stat. § 363.03, subd. 1 (1980).[1]

In May 1985, the trial court granted Gunville's motion for an advisory jury under Minn.R.Civ.P. 39.02, and reserved ruling on similar motions by the other three appellants. The *Gunville* case was to be tried first. No objection was raised to the trial court's suggestion that the testimony and record in *Gunville* be used, with supplementation where necessary, as a basis for decision in the remaining three actions.

At the close of the evidence in *Gunville*, the advisory jury found that respondent had forced and coerced Gunville to retire and that respondent had acted with willful indifference to his rights. Appellants' counsel thereafter moved to amend all four complaints to include claims of fraudulent

---

1. Appellants' complaints also included allegations that respondent's conduct amounted to intentional infliction of emotional distress. In November 1984, the trial court granted partial summary judgment to Hanna on these claims. This grant of partial summary judgment has not been raised as an issue on appeal.

misrepresentation. The trial court indicated that it would allow amendment of the complaints if appellants agreed to submit the fraud claims to the court without a jury. Appellants consented, and the complaints were amended. The record in *Gunville* was reopened to permit presentation of additional evidence on the fraud claim. That record was thereafter supplemented with additional testimony in the remaining three cases.

The trial court subsequently issued separate and detailed findings of fact, conclusions of law, and orders for judgment in each case. Rejecting the advisory jury's findings, the trial court concluded that respondent's offer of early retirement did not unlawfully discriminate on the basis of age, that respondent did not force or coerce any of the appellants to elect early retirement, and that respondent did not make misrepresentations so as to fraudulently induce any of the appellants into accepting an offer of early retirement. Judgments were entered.

Appellants moved for a new trial or amended findings. Following a hearing, the trial court issued an order denying these motions. Separate notices of appeal were filed, and consolidation was subsequently ordered by this court.

Appellants' major contention is that the evidence does not sustain the trial court's findings and conclusions. We disagree and affirm.

### FACTS

In 1978, respondent's Domestic Iron Ore Division owned and/or managed six operations: Moose Mountain located in Canada; Pilot Knob located in St. Louis, Missouri; Groveland Mine located in Michigan; Butler Taconite located in Nashwauk, Minnesota; National Steel Pellet Company located in Keewautin, Minnesota; and its division offices located in Hibbing, Minnesota. Due to adverse economic conditions, respondent has since closed all opera-

tions located outside Minnesota and curtailed production at National by 50%. In 1980, Butler was temporarily closed, and shortly before trial in this case, Butler was permanently closed.

As a result of these plant reductions and closures, respondent sought to make corresponding reductions in its work force. A plan was developed to offer voluntary early retirement to certain eligible employees in the salaried work force.[2] Under the plan, any salaried employee at least 58 years of age with at least 30 years of service could elect to retire and receive full pension benefits, plus an additional supplement of $375 per month until eligible for social security benefits at age 62.

The original plan was first offered to eligible employees at the division offices in Hibbing in the spring of 1980. Ten salaried employees accepted the offer and five declined. Following the closure of Pilot Knob in the latter half of 1980, respondent offered early retirement to eligible employees at National and Butler. Twelve employees accepted this second offer and thirteen declined, including Rapovich, Shea, and Miller.

In early 1981, with the closure of Groveland, respondent offered a modified version of the original plan. The offer was expanded by reducing the years of service requirement from 30 to 15 years and by guaranteeing payment of the monthly supplement for a minimum period of one year for those retirees who would turn 62 prior to receiving one year of supplements. In order to further reduce its work force, respondent also intended to reorganize and restaff by placing its most capable employees in available positions and laying off the rest. These restaffing decisions were to be made after respondent had received decisions from those eligible for early retirement.

As a result of the third offer, 33 salaried employees, including Gunville, Rapovich,

---

**2.** Respondent's plants had two pay systems: the larger bargaining unit or wage-earning union labor force and the smaller salaried work force.

and Miller, retired early and six declined, including Shea. Those six were considered at the restaffing meetings held in February 1981. As a result of the reorganization, 70 salaried employees were reassigned to different positions and 58 were laid off. Of the six who initially rejected the offer of early retirement, two, including Shea, were allowed to retire under the plan after reassignment and demotion, three continued to work for respondent, and one never returned to work from sick leave.

### Raymond J. Gunville

Gunville was first employed by respondent in 1939. In 1942 he entered the military and was honorably discharged in 1944. He was not rehired by respondent until 1955. In 1958, he became a safety engineer and retained that salaried position at the National plant until his retirement on April 1, 1981 at the age of 61.

Gunville was first presented with the early retirement offer in late January 1981 when he met with Ron Martinson, the general manager at National, and Fred Teske, respondent's benefit expert from its executive offices in Cleveland. Martinson testified that he explained that the company was offering early retirement to eligible employees because of the recent closure of the Groveland plant and because there was "going to be a reorganization of the Division office that affected quite a few positions in the shrinking company." Gunville was informed that he might not be able to retain the same position. He was assured that acceptance was strictly voluntary but that his decision was required in two weeks.

At this first meeting Gunville requested, as he had on several prior occasions throughout his employment with respondent, that his years of service be increased to include the years 1939–1955 so that his pre-war starting date would be reflected in his pension benefits. In early February, that request was denied. Sometime thereafter, Gunville went into Martinson's office and stated: "I don't want to retire, but I guess you want me to." Martinson again indicated that the offer was voluntary, but

Gunville replied: "Well, I'm going to retire."

On cross-examination, the following exchange occurred between Gunville and respondent's attorney:

Q So when you left that [second] meeting you understood that you had the option on the one hand of taking a retirement package; or on the other hand, turning down and going through this staffing process along with all the other employees and perhaps ending up with a job, perhaps ending up with no job, perhaps ending up with a different job; isn't that right?

A Yes.

### George Rapovich

Rapovich was employed by respondent in 1946 and held a variety of jobs over the next 34 years. In 1977, he became a plant foreman at National and in late 1980 he was transferred to pit foreman. He retired on April 1, 1981 at the age of 61.

Rapovich was offered early retirement twice in 1980 and declined both offers. In January 1981, he was again offered early retirement. When he met with Martinson and Teske, Rapovich was given the same information as Gunville had been given. Unlike the first two offerings that had been made to him in 1980, however, Rapovich was now informed by Teske that his current position could not be guaranteed if he chose to continue working. Rapovich at first declined.

After a second meeting with Martinson during which Martinson reemphasized that there were no guarantees that Rapovich would retain the same job, Rapovich informed him that he would retire. Rapovich explained that he thought respondent was going to shut down and that if "the picture is that bleak, * * * I suppose I had better take it."

On cross-examination, the following exchange occurred:

Q So you, sir, balanced on the one hand the fact that you could go back to the bargaining unit but suffer a lower pen-

sion; you balanced the uncertainty of the future, not knowing what job you might get, against the possibility of locking in both the salaried pension and the supplement the company was offering you, and you made the decision to retire, didn't you?

A  Yes, I did.

Q  You had at least those two choices? You could have gone back to the bargaining unit or you could have retired?

A  Well, with the picture that was painted for me, I thought Hanna was on the decline.

*John M. Miller*

Miller was employed by respondent in 1948 and held various hourly positions until 1973 when he was promoted to the salaried position at National of maintenance foreman.  He retired on April 1, 1981 at the age of 58.

Miller was first offered early retirement in the fall of 1980 when he was 57 years old.  He declined this offer.  In late January 1981, about two weeks after his 58th birthday, Miller was again offered early retirement.  At his meeting with Martinson and Teske, Miller was given the same information as had been given Rapovich and Gunville: the plan was voluntary, Miller could not be guaranteed the same position if he chose to continue working, and his decision must be received within two weeks.

In the following weeks, Miller gave the management at respondent conflicting signals and engaged in what he himself termed "stalling off" or "stalling time," whereby he would inform Martinson or others that he would retire and then later change his mind.  He repeated this process at least three times before the February 1981 restaffing meetings, where he was not considered because his most recent decision had been retirement.  As a result, another employee was assigned to his job. During the month of February, Miller again changed his decision at least twice.

In early March, Miller called LeRoy Anderson, the general manager at the division offices, and told him that he did not want to retire.  Miller testified that Anderson began yelling at him and informed him that he had better accept the retirement offer.  Anderson, however, testified that he had told Miller that he did not care what Miller did and that he only wanted Miller to make a firm decision.

On March 11, Miller informed Martinson that he wanted to continue working.  Martinson promised to send a memo to Anderson informing him of Miller's decision.  Martinson then went out of town. Fearing that Anderson might fire him if he changed his mind another time, Miller decided to sign his retirement papers without contacting Martinson again.  His retirement became final on April 1, 1981.

During Miller's cross-examination, the following exchange occurred:

Q  Those were the choices facing you? Can I take the salaried pension now, lock in the higher pension and go home and not work; or should I stay at work in the bargaining unit and face the strong possibility of a lower pension in the future; isn't that right?

A  Yes.

\*    \*    \*    \*    \*    \*

Q  You had to consider on the one hand should I try and keep a foreman's job, or should I try and retire and get this good pension, or should I try to continue work in the bargaining unit, take a lesser pension.  Isn't that right?

A  That's right.

Q  After considering all those factors, you decided the best course for you was to lock in that salaried position?

A  Yes.

*Joseph M. Shea*

Shea began his employment with Butler Brothers, a predecessor of respondent, in 1941.  He entered the military in 1942, was honorably discharged in 1945, and immediately resumed employment with Butler Brothers.  From 1949 to 1969, he worked at the district office as an assistant pur-

chasing agent. In 1969, he became the purchasing agent at Butler and remained in that position until his retirement on April 1, 1981 at the age of 58.

Shea was first offered early retirement in the fall of 1980. He declined. He was again approached in late January 1981, when he met with George Kotonias, the general manager at Butler, and Tracy Lee, who worked in respondent's employee benefits department. Similar to Martinson's January meetings with Miller, Gunville, and Rapovich, Kotonias emphasized that respondent's future was uncertain, that he was not even sure his own job was safe, and that an answer was required within two weeks. While on vacation, Shea called Kotonias and left word that he had decided not to retire.

During the February 1981 restaffing meetings, performance evaluations of the three remaining purchasing agents were compared. It was decided that Shea would be reassigned to a different position and receive a corresponding pay cut. Shea's age and his rejection of the early retirement offer were not discussed nor were they factors in the evaluation.

Soon after returning from vacation, Shea was called into Anderson's office at the division offices. Anderson told Shea he was being replaced and demoted to a buyer and that he would be receiving a decrease in salary. Shea then asked if the early retirement offer was still open to him and was informed that it was. Shea indicated that he needed time to consult with his wife, who was on a trip.

The next day, Anderson and Thomas Wilson, respondent's director of human resources, stopped by Shea's office to ask for a decision. Shea indicated he had been unable to reach his wife. On February 20, Shea had told Kotonias that he had not yet made a decision and Kotonias told him to take his time. During a staff meeting that same day, Shea received a call from Anderson. Shea testified that Anderson asked him if he had made up his mind yet, to which Shea replied, "ah heck, I'll go."

Shea asked his secretary to type up a letter accepting retirement.

## ISSUES

1. Are the trial court's findings of fact and conclusions of law justified by the evidence and not contrary to law?

2. Are appellants entitled to new trials because they were denied jury trials on the fraud claims?

3. Is the trial court bound by the advisory jury's responses to the special verdict questions?

## ANALYSIS

### I

On review, the trial court's findings will not be disturbed if they are reasonably supported by the evidence in the record considered as a whole. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). Findings made by a court sitting without a jury must be upheld unless clearly erroneous. Minn.R.Civ.P. 52.-01. "Due regard" must be given to the "opportunity of the trial court to judge the credibility of the witnesses" and the findings "will not be upset merely because a reviewing court may view the evidence differently." *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn.1985).

Appellants challenge several of the trial court's findings and conclusions. In particular, they contend that the evidence does not sustain the trial court's determinations that respondent's early retirement program did not unlawfully discriminate on the basis of age and that respondent did not force or coerce any of the appellants to accept early retirement. They also assert that the trial court's determination that respondent did not commit fraud in any respect is not justified by the evidence.

*Discrimination Claims*

Under the Minnesota Human Rights Act, it is an unfair labor practice for an employer "to discharge an employee" or "to discriminate against a person with respect to his hire, tenure, compensation, terms, up-

grading, conditions, facilities, or privileges of employment" on the basis of age. Minn. Stat. § 363.03, subd. 1(2)(b), (c) (1980). In adjudicating cases brought under the Act, the Minnesota Supreme Court has adopted the three-part test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–22 (Minn.1986); *Danz v. Jones*, 263 N.W.2d 395 (Minn.1978) (analysis first adopted).

The *McDonnell Douglas* test consists of a prima facie case, an answer by the employer, and a rebuttal. *Sigurdson*, 386 N.W.2d at 720. To establish a prima facie case of age discrimination, a party must show that he was a member of a protected class, that he was qualified for the position that he held, that he was discharged, and that he was replaced by a younger person. *Akerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir.1982); *see also Hauge v. Country Club Market, Inc.*, 374 N.W.2d 507, 508 (Minn.Ct.App.1985).

The trial court in this case reasoned that because appellants voluntarily retired and were not forced or coerced into making these decisions, they had failed to establish constructive discharges and thus failed to prove a prima facie case of age discrimination. Constructive discharge occurs when "an employee resigns in order to escape intolerable working conditions created by illegal discrimination." *Continental Can Co. v. Slate*, 297 N.W.2d 241, 251 (Minn. 1980) (case involving claims of sex discrimination and harassment under the Minnesota Human Rights Act). Constructive discharge may also occur when the employer has created a situation in which a reasonable person would feel compelled to resign or retire. *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir. 1981) (case brought under the Age Discrim-

ination in Employment Act, 29 U.S.C. §§ 621–34).[3]

Appellants concede that a *voluntary* offer of early retirement is not discriminatory. They emphasize, however, that such a reduction-in-force cannot be intentionally targeted against older employees so as to force or coerce their retirement. *See Kneisley v. Hercules, Inc.*, 577 F.Supp. 726, 729 (D.Del.1983). Appellants argue *not* that the offer of early retirement itself was discriminatory, but that the *manner* in which it was presented and implemented was discriminatory because its effect was to force or coerce them into retirement. In particular, they insist that respondent should have forewarned them of the plan's arrival, put the plan into writing and explained why it was being offered. They argue that respondent put tremendous pressure on them to accept the plan by painting a bleak picture of Hanna and of their potential futures with the company and that respondent should have held the restaffing meetings prior to making the offers of early retirement.

An employee is not constructively discharged whenever he elects to leave a job which he would rather keep, without regard to the actual reason for his departure. "An employer constructively discharges an employee only if it '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986) (quoting *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir.1975)). In this case, respondent was not obligated to assist appellants in making these difficult decisions. To require it to do so would be to require respondent to treat older work-

**3.** At trial and again on appeal, appellants argue that the *Continental Can* definition of constructive discharge is inapplicable to this case. However, the trial court expressly considered appellants' claims under both standards and concluded that there had been no constructive discharges under either standard. Moreover, respondent correctly notes that although appel-

lants seem to believe that the *Downey* standard is somehow different or perhaps easier for them to meet, they still failed to prove that the reasonable person's compulsion under *Downey* or that the intolerable working conditions under *Continental Can* were caused by illegal or discriminatory activity on the part of the employer.

ers better than the remaining employees, who, during the restaffing process, were subject to being reassigned, demoted, or laid off due to the undeniably adverse economic conditions of the steel and taconite industry.

■ We therefore agree with the well-reasoned memorandum of the trial court in *Gunville* and with its similar statements in

*Miller* and *Rapovich:*

Although the Court agrees with plaintiff that it would have been beneficial to plaintiff if the company had offered the plan after it made its reassignments, the Court cannot find that the company's failure to do so amounted to unlawful discrimination. A termination or demotion is a fairly traumatic occurrence in the life of any worker and is likely to influence his later relationship with the company. Had the company elected to offer the plan after its reorganization, it is likely that a substantial number of employees would have been needlessly demoted or terminated.

The Court must conclude that plaintiff, after weighing his alternatives, voluntarily elected to accept defendant's offer because he did not want to risk a demotion or termination which might have caused him to retire without the extra incentives of defendant's early retirement plan. \* \* \* [D]efendant did not imply that plaintiff was going to be fired with loss or reduction of pension rights or was going to be treated differently from other employees. Although an employer in a workforce reduction cannot force older employees to accept an early retirement program, an employer can offer additional incentives to encourage its employees to accept such a program.

Therefore, the Court must find for the defendant on the issue of age discrimination.

■ Shea's claim was analyzed somewhat differently by the trial court because he had been demoted following his rejection of the offer of early retirement. Similar to the other three cases, the trial court determined that Shea had not been constructively discharged and that he had thus failed to establish a prima facie case of discrimination. The trial court further reasoned that even if it is assumed that Shea did satisfy this first step of the *McDonnell Douglas* analysis, respondent successfully met its burden of providing a legitimate nondiscriminatory reason for his demotion.[4] Once respondent articulated a legitimate, nondiscriminatory reason for its decision to demote Shea, the burden shifted to Shea to prove that respondent's proffered reason was a mere pretext for age discrimination. Because Shea failed to present any evidence of pretext or of discriminatory motive, or to otherwise challenge respondent's reason, the trial court properly rejected his claim of age discrimination. *See Parker v. Federal National Mortgage Association,* 741 F.2d 975, 979–80 (7th Cir.1984) (summary judgment appropriate in age discrimination action when employee failed to set forth evidence which could establish that the employer's proffered nondiscriminatory reason behind its actions was pretextual).

*Fraud Claims*

Appellants next claim that the evidence does not support the trial court's findings and conclusions with respect to their claims of fraud and insist that respondent fraudulently misrepresented the true nature of what was happening to the company.[5]

---

4. At trial, respondent indicated that during the restaffing procedure, Shea was compared with two other purchasing agents for two available positions. Based on their annual performance and on their ability to work with people, it was decided that the other two were better qualified than Shea. Shea was therefore assigned the next highest position available. Testimony was presented indicating that neither Shea's age nor

his decline of the offer of early retirement was discussed at the meeting.

5. Respondent contends that appellants' claims of fraudulent misrepresentation are precluded because the Minnesota Human Rights Act provides their exclusive remedy and they cannot state separate causes of action for fraud and deceit. The trial court declined to rule on this issue because it found that respondent "did not

Their allegations of fraud focus on respondent's failure to make certain disclosures, and to keep them better informed of the restaffing and reorganization process.

■ In each case, the trial court determined that appellants had failed to prove the elements necessary to establish fraudulent misrepresentations or fraudulent failures to disclose. *See Midland National Bank v. Perranoski,* 299 N.W.2d 404, 411 (Minn.1980) (setting out elements of fraudulent misrepresentation). After careful review of the record, we conclude that the trial court's detailed findings and conclusions are amply supported by the evidence.

## II

Appellants claim that they are entitled to new trials because the trial court denied them jury trials on the issues of fraud. However, the trial court allowed post-trial amendment of the complaints *only* after appellants agreed on the record to submit these issues to the court.

■ When an amendment to pleadings would result in substantial delay and prejudice to the opposing party, it is within the discretion of the trial court to deny such a motion. *Hughes v. Micka,* 269 Minn. 268, 130 N.W.2d 505 (1964); *LOL Finance Co. v. Romain Corp.,* 352 N.W.2d 841 (Minn. Ct.App.1984). *See* Minn.R.Civ.P. 15.01. In this case, waivers of jury trials on the fraud claims were meant to alleviate any delay or prejudice which might result from amendment of the pleadings at such a late stage in the proceedings. It was clearly within the discretion of the trial court to impose such conditions upon appellants' ability to assert these new claims.

## III

Finally, appellants contend that the trial court is bound by the advisory jury's findings that respondent had forced and coerced Gunville to retire and that respon-

dent had acted with willful indifference to his rights.

Actions brought under the Minnesota Human Rights Act "shall be heard and determined by a judge sitting without a jury." Minn.Stat. § 363.14, subd. 2. Nevertheless, trial courts often utilize advisory jurys in these types of cases under Minn.R.Civ.P. 39.02, which provides:

In all actions not triable of right by a jury the court, upon motion or of its own initiative, may try an issue with an advisory jury, or the court, *with the consent of both parties,* may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

*Id.* (emphasis added). Because respondent did not consent and, in fact, objected to submitting the case to an advisory jury, the verdict is not binding under rule 39.02.

■ The purpose of an advisory jury is merely to assist the court in discharging its functions, and a trial court retains responsibility for factual determinations. *In re Estate of Murphy,* 269 Minn. 393, 131 N.W.2d 220 (1964); *Sigurdson v. Isanti County,* 363 N.W.2d 476, 480 (Minn.Ct. App.1985), *rev'd on other grounds,* 386 N.W.2d 715 (Minn.1986). The advisory jury's determinations in *Gunville* are therefore not binding on the trial court. Nor need the trial court explain its rejection of the advisory jury's answers to the special verdict questions.

## DECISION

The trial court's denial of appellants' motions for amended findings or, in the alternative, for new trials is affirmed in all respects.

Affirmed.

RANDALL, Judge, dissenting.

I respectfully dissent. I agree with the majority that the trial court was not bound

---

make any fraudulent misrepresentations or fraudulent failures to disclose; and if [it] did, plaintiff did not rely on such statements." We similarly decline to address this argument and

conclude that the evidence sustains the trial court's findings on these issues. *See Hubbard,* 330 N.W.2d at 437 n. 4.

by the advisory jury's determinations, but, in examining the record, I believe the verdict of the advisory jury should be reinstated. Even giving the deference that we must to the factual findings of a trial court, I find that the record supports only the conclusion that the four appellants were subjected to improper pressures to retire based solely on their age.