Patricia **FEGES, Respondent (C0–90–1215), Appellant (C2–90–1216),**

v.

**PERKINS RESTAURANTS, INC., Appellant (C0–90–1215), Respondent (C2–90–1216).**

Nos. C0–90–1215, C2–90–1216.

Court of Appeals of Minnesota.

Jan. 15, 1991.

Review Granted April 4, 1991.

Bradlee Karan, Stuurmans & Karan, Minneapolis, for appellant.

James T. Hynes, Stapleton, Nolan & McCall, St. Paul, for respondent.

Considered and decided by FORSBERG, P.J., and RANDALL and FLEMING *, JJ.

## OPINION

RANDALL, Judge.

Respondent Patricia Feges commenced this action alleging the termination of her employment with appellant Perkins Restaurants, Inc. (1) violated the Minnesota statutory prohibition against age discrimination; and (2) breached a progressive discipline term in her employment contract. Separate trials were held on these two issues. After a trial to the court sitting without a jury, the trial court dismissed the age dis-

---

* Harold W. Schultz Fleming, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

crimination claim and judgment was entered for Perkins on that issue. Subsequently, the breach of contract (*Pine River*) claim was tried to a jury. The jury awarded Feges $49,378.95 in damages plus attorney fees, and judgment was entered accordingly.

Perkins moved for JNOV and a new trial. Feges also moved for a new trial, solely on the issue of post-trial damages. All post-trial motions were denied. The parties filed separate appeals which have been consolidated. We affirm the dismissal of the age discrimination claim but reverse the jury verdict on the breach of contract claim.

## FACTS

### *Age Discrimination*

Patricia Feges, born on June 13, 1931, began her employment with Perkins in September of 1975 as a night prep cook and gradually worked her way into management positions.[1] On September 21, 1980, at age 49, Feges was promoted to general manager of the Coon Rapids restaurant. After approximately 13 months, Feges was removed as general manager and transferred to the position of kitchen manager at a different Perkins restaurant, but with the same salary. Feges conceded at that time she was not qualified to be a general manager and her performance as such was inadequate.

In November of 1984, at age 53, Feges was again promoted to general manager at the Moundsview restaurant and received an increase in pay. As general manager, Feges reported to Leo Sausen, her regional manager. There are eight restaurants in Sausen's region. In January of 1986 Feges received a written appraisal of her performance prepared by Sausen. Feges was rated "fair/acceptable" in two categories, "fully satisfactory" in 42 categories, and "commendable" in 13 categories.

Subsequently, however, Sausen noticed a decline in the quality of Feges' performance. Feges' restaurant was "targeted" as a unit having difficulty in controlling its food and labor costs. Gary Odlund is a "zone training specialist" who is sent to targeted restaurants to help management teams control operating costs. Sausen testified that in June and July of 1987 Odlund was spending two to three days a week at Feges' restaurant. At that same time Sausen, also helping Feges, was spending one to three days a week at her restaurant. Sausen also testified that during the late spring and summer months of 1987 Sausen told Feges he was not satisfied with her performance. Feges admitted she knew Sausen was unhappy with her performance as general manager.

In mid-June of 1987, Feges received from Sausen a written memorandum placing Feges, her assistant manager, and her kitchen manager on probation based on inadequate performance. Subsequently, on July 21, 1987, Sausen informed Feges that on or about August 11, 1987, she was going to be replaced as general manager by Martin Lund. Lund, a 27–year–old man, began working at Perkins on July 6, 1987, but would not be ready to take over until August 11, 1987. Feges agreed to stay until that time. Sausen testified that Feges was told she could have the position of either assistant manager or kitchen manager at the same salary, but refused.

Sausen testified that Feges was terminated because of her inability to control food and labor costs and because of erratic performance.

### *Breach of Contract*

In 1982 Perkins issued what it called a Human Resources Policy Manual (HRPM). The HRPM contains a progressive discipline policy which provides for one verbal and two written warnings which are to be given before termination. The HRPM contains no language of contractual disclaimer. A single copy of the HRPM was sup-

---

**1.** There are three salaried management level positions at each Perkins restaurant. The highest position is general manager. Working under the general manager are the kitchen manag-er and the assistant manager. Together, the three positions are referred to as a management team.

·plied to each restaurant. Feges was given a copy of the HRPM in the early part of 1982, when she was a kitchen manager. The manual was not distributed to all employees, but rather, one copy was given to the management team and kept in the restaurant's office.

Perkins subsequently issued an "employee handbook" in 1984 which contains a similar progressive discipline policy. However, the 1984 employee handbook contains language of contractual disclaimer. In 1986 Feges received a copy of the "Perkins Confidential Management Systems and Operations Manual" (Ops manual), which also contains a similar progressive discipline policy. This manual was not distributed to employees and Feges, as general manager, was instructed to keep this manual under lock and key, as it contains language that it is not to be shown to unauthorized persons. In 1987 a second "employee handbook" was issued. Feges testified she did not receive the 1987 handbook until after she was informed of her termination on July 21, 1987.

Feges testified she never received a verbal warning before being terminated. Although Feges knew Sausen was not happy with her performance, Sausen concedes he never used the term "warning" and never told Feges "if she did not improve she would be terminated." Feges agrees the written warning of June 15, 1987, suffices as a "first written warning" as contemplated by the progressive discipline policy. Regarding the final written warning, Sausen testified that was satisfied by a written performance evaluation dated July 21, 1987. However, we note this evaluation was not given to Feges until the same day she was informed of her termination.

### ISSUES

1. Did the trial court err by dismissing Feges' claim of age discrimination?

2. Does the evidence support the jury's verdict that the progressive discipline policy contained in the HRPM was a term of Feges' employment contract?

### ANALYSIS

#### I.

*Age Discrimination*

Findings of fact made by a trial court sitting without a jury will not be set aside unless they are clearly erroneous, with due regard given to the trial court's opportunity to assess the credibility of the witnesses. *Shea v. Hanna Mining Co.*, 397 N.W.2d 362, 367 (Minn.App.1986). The trial court's findings will not be disturbed merely because the reviewing court might view the evidence differently. *Id.*

The Minnesota Human Rights Act provides that it is unfair employment practice for an employer, because of age, to discharge an employee. Minn.Stat. § 363.03, subd. 1(2)(b) (1986). In employment discrimination cases brought under the Act, Minnesota has adopted the three-part test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–22 (Minn.1986); *Danz v. Jones*, 263 N.W.2d 395 (Minn.1978) (analysis first adopted).

Under the *McDonnell Douglas* test, the plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's adverse employment decision. Third, should the defendant carry this burden, in order to prevail, the plaintiff must then prove by a preponderance of the evidence the legitimate reasons offered by the defendant were merely a pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 802–804, 93 S.Ct. at 1824–25.

The employer's offered nondiscriminatory reasons for termination must be based on sufficiently objective criteria to provide a fair opportunity for the employee to demonstrate pretext, if pretext exists. *See State v. Scientific Computers, Inc.*, 393 N.W.2d 200, 203 (Minn.App.1986).

The trial court found the first and second parts of the *McDonnell Douglas* test were met; that is, Feges established a prima facie case,[2] and Perkins rebutted it by demonstrating a legitimate nondiscriminatory reason for removing Feges as general manager. But the trial court then concluded Feges failed on the third part as she did not prove by a preponderance of the evidence that Perkins' business reasons for terminating her were merely a pretext for age discrimination. We agree.

Feges argues the evidence submitted by Perkins to demonstrate legitimate business reasons for her termination were based on purely subjective data. We disagree. Finding of fact #16 states in part:

> [Feges] was removed because of Mr. Sausen's subjective analysis of the objective business figures showing the position of [the restaurant managed by Feges] in relationship to the other Perkins restaurants in the region. Mr. Sausen removed her because in his business judgment her performance as manager was deficient.

Finding #17 provides Feges' performance in the area of food and labor costs was erratic and, based on objective figures, Feges' performance was worse than any other manager in the region for the time period from January 1, 1987, through August 8, 1987, the end of her employment. These findings are supported by the record.

Defendant's (Perkins') Exhibit #3 compares food and labor costs percentages of Feges' restaurant with the average food and labor cost percentages of the other stores in the region. It shows from September 1986 through July 1987, with only one exception, Feges' food cost percentage was higher than the regional average. It also shows over the same time period Feges' labor cost percentage was higher than the regional average for every month except July 1987, which was the last full month of Feges' employment. These figures comprise a "summary of a series of computer-generated trend analysis" prepared by Sausen in late August or September of 1987. Although the summary was not prepared until after Feges' termination, the data it was based upon was generated every month during Feges' employment, and was distributed to both regional managers and the store managers. Thus, Sausen had the objective data and could observe adverse trends long before Feges' termination.

In June 1987, Sausen ranked the eight restaurants in his region for the time period of January 1987 through May 1987. With respect to food costs, only one restaurant ranked lower than Feges' restaurant. Sausen testified this restaurant ranked lower because it had one month with an unusually high food cost percentage which "spiked" its average. With respect to labor costs, two restaurants ranked lower than Feges' restaurant. Sausen testified, however, one of these restaurants was in a highly competitive area with about 30 other restaurants within walking distance. Sausen also testified the general manager of the other restaurant had less than six months experience.

A general manager of one of the eight restaurants in Feges' region testified, based on her review of weekly "flash reports" from January 1, 1987, through July 1987, there was a "lack of performance" by Feges. Flash reports included information regarding weekly revenues, food costs, and labor costs of each restaurant within the region and were sent to all general managers in the region.

Feges was meeting the 1987 "plan" goals for her restaurant. However, all of the restaurants in her region were meeting their 1987 goals, which proved to be "soft." Feges' performance did compare poorly to other general managers in her region.

2. In the context of an age discrimination action involving termination of employment, the elements of a prima facie case are:
(1) that the plaintiff was a member of the protected class,
(2) that the plaintiff was qualified for the position held,
(3) that the plaintiff was discharged, and
(4) that the employer assigned a nonmember of the protected class to do the same work. *Rademacher v. FMC Corp.*, 431 N.W.2d 879, 882 (Minn.App.1988).

Also, Sausen testified the great amount of time he spent with Feges in June and July of 1987 was not normal and had a negative impact on his ability to meet his other responsibilities.

■ It is true Feges was replaced by a younger person, but that fact, without more, cannot be determinative. In the normal course of business when an older person is legitimately let go for a proper reason, the replacement usually is someone younger. Few job specifications dictate initial hiring be restricted to older people. Provided termination is not discriminatory, as we find here, termination of an older person is not an impermisible time for a company to choose a younger person to work into the ranks. Replacement of an older person by a younger one, although one element of a prima facie case, cannot make a case by itself if unsupported by other relevant evidence.

## II.

### Breach of Contract

■ When reviewing a jury verdict on appeal, this court will consider the evidence in the light most favorable to the verdict. The verdict will be sustained if the evidence reasonably supports it. *Gilmore v. Control Data Corp.*, 442 N.W.2d 835, 838 (Minn.App.1989) (citing *Kuehl v. Nat'l Tea Co.*, 310 Minn. 48, 50, 245 N.W.2d 235, 237 (1976)). The answer to a special verdict question will be set aside "only if perverse and palpably contrary to the evidence." *Jacobs v. Rosemount Dodge–Winnebago So.*, 310 N.W.2d 71, 76 (Minn.1981).

If job security provisions contained in a personnel handbook or manual meet the requirements for contract formation, they may become enforceable as contractually binding on the employer even though adopted subsequent to an at-will hiring. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 629–30 (Minn.1983). The language at issue must be definite in form so as to constitute an offer and it must be communicated to the employee/offeree. *Id.* at 626.

In the special verdict form, the jury found the HRPM issued in 1982 was part of Feges' employment contract with Perkins. Perkins argues, however, the contract formation requirement of communication of the offer is missing. We agree. There was no dissemination of the HRPM to Feges. The progressive discipline policy contained in the HRPM was not communicated to Feges as an offer that could be accepted to form a contract. *See Pine River*, 333 N.W.2d at 626 (the offer must be communicated by "dissemination of the handbook to the employee"). Here, one copy of the HRPM was given to the management team of each restaurant during a management meeting. This single copy of the HRPM was kept in the manager's office of the restaurant. The HRPM was not distributed to employees.

Although the first page of the HRPM states it "applies to all unit [restaurant] employees," it also states it is "designed for field use by the local unit [restaurant] management team." Feges testified when she hired a new employee, she would "flip through" the HRPM with them. Feges herself referred to the HRPM as a "tool" and a "reference" to be used by the management team when informing new employees about their job.

Even viewing the evidence in the light most favorable to the verdict, the record here cannot support the formation of a *Pine River* contract and a breach thereof. The evidence does not establish the HRPM or the progressive discipline policy contained therein were disseminated to Feges.

■ The 1984 handbook contains a progressive discipline policy similar to that contained in the HRPM. Although it may have been disseminated, the 1984 handbook is not contractually binding because it contains language of contractual disclaimer. An employer may include limiting language in the personnel handbook or manual in order to avoid contractual obligation. *See Audette v. Northeast State Bank of Minneapolis*, 436 N.W.2d 125, 127 (Minn.App. 1989) (employer was not contractually bound where manual included statement

that "the language is not intended to create a contract").

■ The Ops manual, also containing a progressive discipline policy, was not distributed to employees and Feges makes no argument any policies contained therein are contractually binding. Finally, the 1987 employee handbook was not distributed until *after* Feges was informed of her termination. Therefore, the progressive discipline policy contained in that handbook is not relevant.

Because we reverse the jury's verdict on the breach of contract claim, we do not reach the issue of post-trial damages.

### DECISION

We affirm the trial court's dismissal of Feges' age discrimination claim. However, we reverse the jury's verdict awarding damages for breach of contract. It is not supported by the evidence. Therefore, Feges is not entitled to damages.

Affirmed in part, reversed in part.