333 N.W.2d 622 (1983)
PINE RIVER STATE BANK, Appellant,
v.
Richard E. METTILLE, Sr., Respondent.
No. C8-82-543.
Supreme Court of Minnesota.
April 29, 1983.
*624 Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Robert E. Salmon, O.C. Adamson II and J. Richard Bland, Minneapolis, Lundrigan, Hendricks & Lundrigan and Wilbert E. Hendricks, Pine River, for appellant.
Van Drake & Van Drake and Stephen R. Van Drake, Brainerd, for respondent.
Heard, considered and decided by the court en banc.
SIMONETT, Justice.
An employee hired for an indefinite, at-will term claims his discharge was in breach of his employment contract as subsequently modified by an employee handbook. A jury awarded the employee damages and the employer appeals from a denial of its post-trial motions. We affirm.
In early 1978 respondent Richard Mettille, then unemployed, nearly 48 years of age, married and living in St. Paul, sent his resume to the appellant Pine River State Bank. After an interview, the bank offered Mettille a job at a salary of $1,000 a month or $12,000 a year. Mettille accepted, moved to Pine River, and started work as a loan officer on April 10, 1978. The employment agreement was entirely oral. Nothing was said as to the position being permanent or for any specific term. Mettille conceded that he felt free to leave the bank and to take a better job elsewhere if he wished to do so.
Mettille survived his 6-month probationary period and was shortly given the title of loan officer. His duties were to lend, procure insurance on loan collateral, file UCC financing statements, and prepare reports on student loans.
Late in 1978 the bank distributed to its employees, including Mettille, a printed Employee Handbook. The handbook had been drafted by the bank's president, E.A. Griffith, who relied heavily on a model handbook he had received at a recent seminar on employee relations sponsored by the Minnesota Bankers Association. The handbook contained information on the bank's employment policies, including such matters as working hours, time off, vacations, and sick leave. With respect to employee responsibilities, the handbook discussed such matters as punctuality, confidentiality of the work, personal appearance and conduct, and telephone courtesy. The handbook also contained sections on "job security" and "disciplinary policy." According to Griffith, the handbook was intended as a source of information for employees on bank procedures and as a guideline within the bank so that people would know when vacations would be available and how many days the employee would be allowed for vacations. Griffith testified that he never intended the handbook to become part of an employee's employment contract with the bank.
In April 1979 Mettille received his annual performance review and with it a 7% raise. Apparently, about this time he also took out a home improvement loan with the bank. The following September state bank officials conducted an unannounced examination of the Pine River State Bank, and after reviewing the loan portfolio, reported to Griffith that some "technical exceptions" existed, i.e., failures to comply with the applicable law and regulations. Griffith then ordered his own independent review of the 85 files noted in the examiner's report. This investigation disclosed that 58 of the 85 files contained "serious" technical exceptions and that Mettille was responsible for the serious technical exceptions in 57 of these 58 files. Thus, 28 files showed no vehicle certificate of title; 33 files showed *625 no insurance covering the secured collateral; 4 files showed inadequate insurance; 6 files showed failure to record financing statements properly (although here the bank disagreed with the examiner that the financing statement filings had been improper); and 4 files showed expired financing statements. Characterization of these deficiencies as "serious" was made by the bank officers, because those errors created possible loss to the bank. They testified that the defective files involved loans totaling over $600,000.
Mettille was home ill at the time of the audit by the bank examiners and the subsequent review of the files by the bank. On September 28, 1979, Mettille returned to work. The president called Mettille into his office and fired him. The parties at this time did not review the list of technical exceptions. The disciplinary procedures outlined in the handbook were not followed, nor was the handbook even mentioned. Mettille was given 2 months' severance pay.
The reason for Mettille's dismissal and whether that dismissal was for good cause were sharply contested. The bank claimed that the only reason given for the dismissal was the existence of loan errors, although excessive sick leave and a reduction in force were also factors. Mettille alleged that he was fired because of a personality dispute with his superiors. He argued that no problems were discovered in the course of previous bank examinations, that the exceptions in the 1979 audit were correctable and, in fact, were corrected within a month after he was fired. He disputed that the exceptions were "serious." There was also testimony that Mettille had never received any reprimands or complaints as to his performance prior to September 1979 and that he was loyal and "tried hard." At the time of trial Mettille was still unemployed.
In November 1980 the bank sued Mettille on two notes on which he was in default. Mettille counterclaimed, alleging that the bank had breached his contract of employment by dismissing him without cause and in violation of required disciplinary procedures. The case was tried in January 1982 and the jury found: (1) that the parties had a contract under which the defendant could not be terminated without good cause; (2) that the bank terminated Mettille without good cause; and (3) that Mettille sustained damages of $27,675. The trial judge deducted from the damages award the amount owed on the notes and ordered judgment in favor of Mettille and against the bank for $24,141.07. Both parties moved for a new trial. The bank's main argument was that Mettille's employment contract was at-will and that it was free to terminate him as it did. Mettille argued that he should have been permitted to show mental anguish to recover more damages. The trial judge denied both motions. Only the bank appeals.
The issues may be broadly stated: (1) Can a personnel handbook, distributed after employment begins, become part of an employee's contract of employment? (2) If so, are job security provisions in the handbook enforceable when the contract is of indefinite duration? and (3) In this case, was the employee's summary dismissal without following the job termination procedures of the handbook a breach of contract by the employer? Other issues to be discussed briefly relate to evidentiary rulings and damages.

I.
Whether a handbook can become part of the employment contract raises such issues of contract formation as offer and acceptance and consideration. We need first, however, to describe the Pine River State Bank's handbook. It contains, as we have said, statements on a variety of the bank's employment practices or policies, ranging from vacations and sick leave to personal conduct and appearance. Our inquiry here, however, concerns only the job security provisions. A section entitled "Performance Review" provides for at least an annual review of the employee's work.[1] Another *626 section entitled "Job Security" speaks in general, laudatory terms about the stability of jobs in banking.[2] The key section, central to this case, is entitled "Disciplinary Policy." This section provides for what appears to be a three-stage procedure consisting of reprimands for the first and second "offense" and thereafter suspension or discharge, but discharge only "for an employee whose conduct does not improve as a result of the previous action taken." The section concludes with the sentence, "In no instance will a person be discharged from employment without a review of the facts by the Executive Officer."[3]
Generally speaking, a promise of employment on particular terms of unspecified duration, if in form an offer, and if accepted by the employee, may create a binding unilateral contract. The offer must be definite in form and must be communicated to the offeree. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions. Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer. Thus, in Degen v. Investors Diversified Services, Inc., 260 Minn. 424, 110 N.W.2d 863 (1961), where the employee was told he had a great future with the company and to consider his job as a "career situation," we said these statements did not constitute an offer for a lifetime employment contract.
If the handbook language constitutes an offer, and the offer has been communicated by dissemination of the handbook to the employee,[4] the next question is *627 whether there has been an acceptance of the offer and consideration furnished for its enforceability. In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer. We have so held in Stream v. Continental Machines, Inc., 261 Minn. 289, 293, 111 N.W.2d 785, 788 (1961), and Hartung v. Billmeier, 243 Minn. 148, 66 N.W.2d 784 (1954) (employer's promise of a bonus made after the employee started working held enforceable).
An employer's offer of a unilateral contract may very well appear in a personnel handbook as the employer's response to the practical problem of transactional costs. Given these costs, an employer, such as the bank here, may prefer not to write a separate contract with each individual employee. See Note, Protecting At Will Employees against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L.Rev. 1816, 1830 (1980). By preparing and distributing its handbook, the employer chooses, in essence, either to implement or modify its existing contracts with all employees covered by the handbook. Further, we do not think that applying the unilateral contract doctrine to personnel handbooks unduly circumscribes the employer's discretion. Unilateral contract modification of the employment contract may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify the handbook provisions.
We conclude, therefore, that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract.

II.
The next issue is whether handbook provisions relating to job security require special treatment, i.e., whether they are an exception to the general rule just discussed. Put more precisely, the question is whether, in an at-will hiring, the job security provisions in a subsequently adopted employee handbook are enforceable. On this issue, the courts are split, see Sherman v. St. Barnabas Hospital, 535 F.Supp. 564, 573 (S.D.N.Y.1982) (citing cases), and our own case law is unclear.
Where the hiring is for an indefinite term, as in this case, the employment is said to be "at-will." This means that the employer can summarily dismiss the employee for any reason or no reason, and that the employee, on the other hand, is under no obligation to remain on the job. See Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). Nor will a claim by the employee that he or she was promised "permanent" or "life-time" employment change the at-will nature of the hiring, Skagerberg v. Blandin Paper Co., 197 Minn. 291, 266 N.W. 872 (1936), at least not in the absence of some kind of additional consideration supplied by the employee which is uncharacteristic of the employment relationship itself. Bussard v. College of St. Thomas, 294 Minn. 215, 200 N.W.2d 155 (1972).
Here the employee does not claim, nor could he, that he was promised "permanent" employment. The law is hesitant to impose this burdensome obligation on an employer in the absence of an explicit promise to that effect. See Degen v. IDS, Inc., 260 Minn. 424, 428-29, 110 N.W.2d 863, 866-67 (1963). Instead, the respondent employee is claiming that his job termination was wrongful because the job security provisions set out in the employee handbook were not followed. The appellant bank, relying on the "at-will" doctrine as expressed in our cases beginning with Skagerberg, argues that without additional consideration, the job security provisions are not enforceable. Other cases cited by the bank *628 hold that job termination restrictions, even if part of a contract for an indefinite duration from the outset, can never be enforceable. See Shaw v. S.S. Kresge, 167 Ind. App. 1, 328 N.E.2d 775 (1975).
This court did say, by way of dictum in Cederstrand, that parties to a contract for an indefinite duration might transform the contract into one where the employee will not be dismissed without cause, and we observed, "This is not to say that such a contract would be unenforceable." 263 Minn. at 536, 117 N.W.2d at 223. We need, therefore, to examine the three reasons given for the unenforceability of job termination restrictions in an employment contract of indefinite duration: (1) the at-will rule takes precedence over any such restrictions; (2) the restrictions ordinarily lack the requisite additional consideration; and (3) mutuality of obligation is missing.
The first argument, that because the contract specifies no duration the parties did not intend any job termination restrictions to be binding, is without merit. The argument misconstrues the at-will rule, which is only a rule of contract construction, as a rule imposing substantive limits to the formation of a contract. See Restatement (Second) of Agency, § 442, comment a (inference that employment is at-will may be rebutted by specific terms of the agreement). The general rule is that contracts for a specified duration can nonetheless be terminated during the period of the contract if the employer has good cause. Thomsen v. Independent School District No. 91, 309 Minn. 391, 244 N.W.2d 282 (1976). When a contract is for an indefinite duration, the duration is not set, and a corollary is that either party may then terminate it at any time for any reason. Further, if the contract purports to establish "permanent employment," this will be interpreted as a contract for an indefinite period, and hence also at-will. Thus, in Bussard v. College of St. Thomas, 294 Minn. 215, 223, 200 N.W.2d 155, 161 (1972), we said, "[T]he somewhat arbitrary rule of most jurisdictions that a contract for `permanent employment' will be construed to be terminable at the will of either party * * * is arguably too mechanical an answer to the more basic issue of ascertaining the real intent of the parties" (emphasis added). See also Note, Employment Contracts of Unspecified Duration, 42 Colum.L.Rev. 107, 120-21 (1942).
The cases which reason that the at-will rule takes precedence over even explicit job termination restraints, simply because the contract is of indefinite duration, misapply the at-will rule of construction as a rule of substantive limitation on contract formation. See, e.g., Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P.2d 779 (1976); Shaw v. S.S. Kresge, 167 Ind.App. 1, 7, 328 N.E.2d 775, 779 (1975); Uriarte v. Perez-Molina, 434 F.Supp. 76 (D.C.D.C. 1977). It should not be necessary for an employee to prove a contract is of "permanent" employment or for a specified term in order to avoid summary dismissal if the parties have agreed otherwise. There is no reason why the at-will presumption needs to be construed as a limit on the parties' freedom to contract. If the parties choose to provide in their employment contract of an indefinite duration for provisions of job security, they should be able to do so.
The second argument against enforceability is, at first glance, more troublesome in view of our case law. The argument is that a provision for job security in a contract of indefinite duration, whether initially promised or subsequently added, is not binding without additional, independent considerations other than services to be performed. In Skagerberg, we noted the general rule that when an employee purchases "permanent" employment with a valuable consideration that is other than and in addition to his services, the employment will be held to be continuous and to extend as long as the employee's work is adequate and there is work to be done. This rule makes sense as a presumption in construing contracts. Where the "permanent" employment is purchased with additional consideration, we have better reason to believe that the parties, in discussing "permanent" employment, were referring to lifetime employment and were not, instead, simply making *629 a distinction between temporary or seasonal employment and employment which is steady or continuing although nevertheless terminable at will. See Pugh v. See's Candies, Inc., 116 Cal.App.3d 311, 326, 171 Cal. Rptr. 917, 925 (1981) (most likely explanation for the independent consideration rule is that it serves an evidentiary function, citing Bussard, supra).
To say that a job security provision in a contract of indefinite duration is never enforceable without additional consideration is to misconstrue the additional consideration exception recognized in Skagerberg. The requirement of additional consideration, like the at-will rule itself, is more a rule of construction than of substance, and it does not preclude the parties, if they make clear their intent to do so, from agreeing that the employment will not be terminable by the employer except pursuant to their agreement, even though no consideration other than services to be performed is expected by the employer or promised by the employee. See Littell v. Evening Star Newspaper Co., 120 F.2d 36, 37 (D.C.Cir.1941); Drzewiecki v. H & R Block, Inc., 24 Cal.App.3d 695, 703-04, 101 Cal.Rptr. 169, 174 (1972). See also Restatement (Second) of Contracts § 80, comment a (1981) (a single performance may furnish consideration for any number of promises). While language in some of our cases may suggest otherwise, our discussion of additional, independent consideration in Skagerberg, Cederstrand, Bussard and Degen was primarily in the context of the employee attempting to avoid a discharge without cause by proving (albeit unsuccessfully in those cases) "lifetime" or "permanent" employment. But none of our cases purport to hold that additional, independent consideration is the exclusive means for creating an enforceable job security provision in a contract of indefinite duration. Handbook provisions relating to such matters as bonuses, severance pay and commission rates are enforced without the need for additional, new consideration beyond the services to be performed. See DeGuiseppe, The Effect of the Employment-at-will Rule on Employee Rights to Job Security and Fringe Benefits, 10 Fordham Urban L.J. 1 (1981). We see no reason why the same may not be true for job security provisions. Accord Note, Protecting At Will Employees, supra, 93 Harv. L.Rev. at 1819-20 (employee's continued labor despite freedom to resign is ample consideration for all express or implied promises, including those relating to job security). Thus, the consideration here for the job security provision is Mettille's continued performance despite his freedom to leave. See, e.g., Carter v. Kaskaskia Community Action Agency, 24 Ill.App.3d 1056, 1059, 322 N.E.2d 574, 576 (1974). As such, the job security provisions are enforceable.
Finally, the third argument is that job security provisions lack enforceability because mutuality of obligation is lacking. Since under a contract of indefinite duration the employee remains free to go elsewhere, why should the employer be bound to its promise not to terminate unless for cause or unless certain procedures are followed? The demand for mutuality of obligation, although appealing in its symmetry, is simply a species of the forbidden inquiry into the adequacy of consideration, an inquiry in which this court has, by and large, refused to engage. See Estrada v. Hanson, 215 Minn. 353, 10 N.W.2d 223 (1943). "If the requirement of consideration is met, there is no additional requirement of * * * equivalence in the values exchanged; or * * `mutuality of obligation'." Restatement (Second) of Contracts § 79 (1981). We see no merit in the lack of mutuality argument; as we pointed out in Cardinal Consulting Co. v. Circo Resorts, 297 N.W.2d 260, 266 (Minn.1980), the concept of mutuality in contract law has been widely discredited and the right of one party to terminate a contract at will does not invalidate the contract. See also Hartung v. Billmeier, 243 Minn. 148, 66 N.W.2d 784 (1954); Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982).
To summarize, we do not find the reasons advanced for the unenforceability of job security provisions in an at-will hiring to be persuasive. We hold, therefore, that where an employment contract is for an indefinite *630 duration, such indefiniteness by itself does not preclude handbook provisions on job security from being enforceable, whether they are proffered at the time of the original hiring or later, when the parties have agreed to be bound thereby. Supportive of the rationale for this holding are, for example, Weiner v. McGraw-Hill, supra; Carter v. Kaskaskia Community Action Agency, supra; Wagner v. Sperry Univac, 458 F.Supp. 505 (1978), aff'd without opinion, 624 F.2d 1092 (1980); Moody v. Bogue, 310 N.W.2d 655 (Ia.App.1981), as well as our own case of Cederstrand.
Not every utterance of an employer is binding. It remains true that "the employer's prerogative to make independent, good faith judgments about employees is important in our free enterprise system." Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404, 1428 (1967). Properly applied, we think that the unilateral contract modification analysis appropriately accommodates the interests of the employee and the employer.

III.
We now apply the principles discussed in the first two sections to the Pine River State Bank's handbook. First of all, it should be noted that this is a breach of contract case; we are determining if there was a contract, what were its terms, and was it breached. We are not dealing with a discharge that is retaliatory, in bad faith or abusive. Nor do we have before us the question, suggested by the employee here, whether public policy should constrain an "at-will" firing. See generally Annot., Modern Status of Rule that Employer May Discharge At-will Employee for Any Reason, 12 A.L.R. 4th 544 (1982).
We do not think that the language in the handbook section entitled "Job Security" constitutes any offer. It is no more than a general statement of policy. Cf. Degen v. IDS, supra (invitation to consider job as a "career situation" not an offer). The provisions of the handbook section entitled "Disciplinary Policy" do, however, set out in definite language an offer of a unilateral contract for procedures to be followed in job termination. The handbook states that "[i]f an employee has violated a company policy, the following procedure will apply." This offer was communicated to the employees, including respondent. Mettille's continued performance of his duties despite his freedom to quit constitutes an acceptance of the bank's offer and affords the necessary consideration for that offer, with the bank gaining the advantages of a more stable and, presumably, more productive work force.[5] Here the jury could find, as it did, that the handbook provisions on disciplinary procedures had become part of respondent Mettille's employment contract, thus restricting the bank's right to terminate Mettille at will.[6]
But in what way do the handbook procedures restrict the bank's right to discharge Mettille at will? Although the disciplinary procedures were admittedly not followed, the trial court apparently construed the *631 handbook to allow summary dismissal for good cause. The jury was asked, in the verdict form, to find if Mettille's dismissal had been "without good cause," and, in instructions to the jury, the jury was told (apparently without objection) that good cause consisted of a breach of the standards of job performance established and uniformly applied by the bank. Whether, assuming a good cause requirement, this was a proper definition of good cause has not been made an issue, and we need not decide it.[7] Nor need we decide if summary dismissal for good cause can be implied or inferred in Mettille's contract or, on the other hand, if summary good cause termination is precluded by the handbook, since the issues were not raised and, in any event, are mooted by the jury's finding of lack of good cause.
It is enough for disposition of this case that the disciplinary provision was applicable and enforceable, and that it was not followed. The bank's only excuse for not following the disciplinary procedures was that it did not have to do so, since Mettille was an "at-will" employee. This argument is without merit, since we have found the procedures to be contractually binding. Had the procedural disciplinary steps been honored, Mettille might have corrected his deficiencies to the bank's satisfaction and have kept his job. The bank did not assert otherwise and there was evidence that the loan file deficiencies were rather easily correctable and that Mettille was amenable to correction. Therefore, we hold that as a matter of law the bank breached its employment contract with Mettille by not affording him the job termination procedures of its handbook, resulting in Mettille's unemployment.

IV.
The appellant bank also contends that the evidence does not support the jury's finding of lack of good cause, that the trial court erred on several evidentiary rulings, and that damages should not include lost wages to date of trial. We find no reversible error.
There was evidence that Mettille's work was unsatisfactory; but there was also evidence of a personality conflict with a supervisor, that Mettille's errors were not serious and were easily correctable, and that other officers' errors were ignored or forgiven. The factual dispute was for the jury.
While the trial court refused to allow into evidence the model handbook from which Griffith, the bank president, drafted his own handbook, the trial court did allow the employee's counsel to cross-examine Griffith about provisions in the model handbook. In particular, counsel was permitted to bring out that the model handbook's annotations contained language cautioning the bank executives that "your handbook constitutes your `contract' with your employees." It would have been better not to have admitted this evidence. Since, however, the bank's purpose in drafting and issuing its own handbook was at issue, under the law of the case, and since Griffith said he relied on the model handbook in drafting his own, we cannot say that the allowance of this testimony so affected the results of the trial as to be prejudicial error. Poppenhagen v. Sornsin Construction Co., 300 Minn. 73, 79-80, 220 N.W.2d 281, 285-86 (1974). The bank also complains that the trial court refused to let it show why errors committed by other loan officers were not serious. The trial court *632 did, however, allow explanations of several of these errors and then sustained an objection because testimony of further errors was repetitious and irrelevant. It seems to us that the bank was given an opportunity to explain generally why these errors of other officers were not as serious as Mettille's, and we cannot say the trial court abused its discretion in so ruling.
The bank also claims that damages should not include lost wages to date of trial. It may well be that had the bank complied with its handbook procedures it could, in due course, have terminated Mettille, but the fact is that termination did not occur in this way. "The measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged would have received had the contract been carried out according to its terms." Zeller v. Prior Lake Public Schools, 259 Minn. 487, 493, 108 N.W.2d 602, 606 (1961). On this record it is not shown that, if the progressive disciplinary steps had been followed, with the employee having been warned and given an opportunity to mend his ways, he would not have retained his employment to date of trial. We cannot say that the evidence does not sustain the damages award. Implicit in this award of lost wages to the date of trial is our recognition that the bank's disciplinary procedures confer some degree of substantive protection to the employee. Without that, the disciplinary procedures here would be virtually meaningless.
Finally, respondent Mettille argues that he should have a limited new trial to show additional damages for mental anguish. The issue is not before us, since respondent filed no notice of review. Minn.R.Civ. App.P. 106.
Affirmed.
COYNE, J., took no part in the consideration or decision of this case.
NOTES
[1] The first paragraph of this section reads:

Everyone wants to know "where he stands." Our performance evaluation program is designed to help you to determine where you are, where you are going, and how to get there. Factual and objective appraisals of you and your work performance should serve as aids to your future advancement.
[2] The section entitled "Job Security" reads:

Employment in the banking industry is very stable. It does not fluctuate up and down sharply in good times and bad, as do many other types of employment. We have no seasonal layoffs and we never hire a lot of people when business is booming only to release them when things are not as active.
The job security offered by the Pine River State Bank is one reason why so many of our employees have five or more years of service. In return for this, Management expects job security from you. That is, the security that you will perform the duties of your position with diligence, cooperation, dependability, and a sense of responsibility.
[3] The section entitled "Disciplinary Policy" reads:

In the interest of fairness to all employees the Company establishes reasonable standards of conduct for all employees to follow in their employment at Pine River State Bank. These standards are not intended to place unreasonable restrictions on you but are considered necessary for us to conduct our business in an orderly and efficient manner.
If an employee has violated a company policy, the following procedure will apply:
1. An oral reprimand by the immediate supervisor for the first offense, with a written notice sent to the Executive Vice President.
2. A written reprimand for the second offense.
3. A written reprimand and a meeting with the Executive Vice President and possible suspension from work without pay for five days.
4. Discharge from employment for an employee whose conduct does not improve as a result of the previous action taken.
In no instance will a person be discharged from employment without a review of the facts by the Executive Officer.
[4] Two of our cases, Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 117 N.W.2d 213 (1962), and Degen v. Investors Diversified Services, Inc., 260 Minn. 424, 110 N.W.2d 863 (1961), dealt with employee handbooks. In Cederstrand, a "control copy" of the employer's personnel policies contained a provision that employees would not be dismissed without good cause. We held, however, that since this dismissal provision did not appear in the separate manuals given to employees it was not a contractual offer to employees but merely a policy guide for supervisors. In Degen, the employer's personnel policy provided for a preliminary discussion between the employee and his immediate supervisor and for a dismissal interview with a member of the personnel department present before termination. We held that the employer's failure to follow this procedure did not create a contract for either lifetime or definite term employment. It is clear that the Pine River State Bank's handbook, both with respect to its contents and its dissemination, differs markedly from the situations in Cederstrand and Degen.
[5] Compare with this approach our cases holding that employee noncompete covenants which are not ancillary to the initial employment contract are not enforceable absent a showing of independent consideration involving something more than just continued services. Davies & Davies Agency v. Davies, 298 N.W.2d 127 (Minn.1980); National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982). There, however, a different public policy is at play, namely, the law's disfavor with restraints on trade, so that noncompete covenants are treated as a special circumstance and, therefore, these cases are not decided strictly according to the principles of contract formation.
[6] The jury was instructed that, to find the handbook a part of the employment contract, it had to find that the bank intended the handbook to be binding on it. On appeal the bank points out this instruction incorrectly imposes a subjective rather than an objective test for formation of a contract. See, e.g., Restatement (Second) of Contracts § 21. This instruction, however, was the law of the case, since the trial court offered to withdraw it and the bank's attorney decided to leave it in, presumably on the grounds it was a more favorable instruction for the bank.
[7] As the bank points out, nowhere in the handbook is the term "good cause" or "just cause" used. See discussion in Toussaint v. Blue Cross and Blue Shield, 408 Mich. 579, 620-25, 292 N.W.2d 880, 895-97 (1980), about the difference between an agreement to terminate only for good cause and an agreement under which the employer may terminate whenever it is reasonably dissatisfied with the employee's performance.

We do not think, however, that Toussaint, which was relied on by respondent and the trial court, aids particularly in construing Mettille's contract. In Toussaint the employees, in accepting employment, had been explicitly assured, both orally and in an employer's manual, that termination would require good cause, so that good-cause termination was a negotiated item of the employees' contracts.