**Carl John THURNER, Relator,**

v.

**PHILIP CLINIC, LTD., Commissioner of Jobs and Training, Respondents.**

**No. C7–87–830.**

Court of Appeals of Minnesota.

Oct. 13, 1987.

---

Carl John Thurner, pro se.

Thomas J. Kraus, Waseca, for Philip Clinic, Ltd.

Hubert H. Humphrey, III, Atty. Gen., Donald E. Notvik, Sp. Asst. Atty. Gen., St. Paul, for Commissioner of Jobs and Training.

Considered and decided by POPOVICH, C.J., and WOZNIAK and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Relator Carl Thurner seeks review of a determination he engaged in misconduct disqualifying him from the receipt of unemployment compensation benefits. We affirm.

## FACTS

Respondent Philip Clinic, Ltd. is owned and administered by Philip P. Philip, a licensed consulting clinical psychologist. In July 1985, Philip hired relator Carl Thurner to act as Program Director of the Philip Chemical Dependency Center, an affiliate of the Philip Clinic. Thurner was also expected to work with the center's chemical dependency patients, promote the Philip Chemical Dependency Center Treatment Program in the community, start an adolescent program, and look into other possible programs. Thurner had an M.A. degree and was identified on Philip's letterhead as a school psychologist. For many years before Thurner was hired by Philip, the two men had been professionally acquainted, and from 1980 or 1981 until he was hired in 1985, Thurner had professionally associated with Philip on a formal consultant basis.

Upon commencing work at the chemical dependency center, Thurner became involved in renewing the center's state license, strengthening certain programs and obtaining information on other programs.

In early December 1985, Philip became dissatisfied with Thurner's absenteeism from his office, changed Thurner's method of compensation from a monthly salary to an hourly rate, changed Thurner's regular office hours to 11:00 a.m. to 8:00 p.m., and told Thurner to keep a record of his time spent away from the office.

In mid-December, Thurner attended a two-day smoking conference. He had previously arranged with Philip to attend the program and expected to receive payment for the time he spent at the conference. Philip's personnel manual provided for paid

administrative leaves for clinic business or continuing education programs. On December 31, however, when Thurner asked for his paycheck, Philip told Thurner he would not be paid for the two days until he submitted a detailed written report on the conference. Thurner became upset, raised his voice, and threatened to call the police if he didn't get his money. During this time, there were patients in the reception area.

Thurner left, and when he returned after lunch he went to the receptionist's desk, demanded his check, went to Philip's office, demanded his check, and threatened to call his attorney. Thurner was never paid for the two days because he did not submit a written report on the conference.

On January 16, Philip told Thurner he noticed Thurner was putting copies of his notes in patient files instead of his original notes. Philip told Thurner to put his original notes in the files, but Thurner did not appear to agree with that procedure and said he had destroyed all of his original notes.

A staff meeting was held the next day and the patient file problem was discussed. A memo of that meeting, prepared by Philip's secretary, indicates Thurner stated he should have a right to develop his own ideas, which was all his original notes were, he believed his notes were his property until they were put into the patient's file, and if he could not keep copies of his notes, he wanted the new procedure in writing.

After reporting several other matters of discussion, the memo concluded:

[Thurner] said that he would not write up a letter about an adolescent program so that Dr. Philip could put his signature on it. * * *

Dr. Philip asked [Thurner] for the time record he agreed/offered to keep on a two-week period. [Thurner] did not keep a record * * *.

[Thurner] then said to Dr. Philip, "I will not do your smoking program, and I will not work with adolescents". He then left the meeting before it was adjourned by Dr. Philip.

Philip discharged Thurner effective January 20, 1986.

Thurner applied for unemployment compensation but was denied benefits by a claims deputy, who determined he had been discharged for misconduct. Thurner appealed to a department referee, who conducted a hearing. Both parties introduced testimony and documents, including Philip's personnel manual, which stated in relevant part:

DISCIPLINARY ACTIONS AND TERM OF EMPLOYMENT

\* \* \* \* \* \*

B. *Disciplinary Action.*

Disciplinary action *may* be taken by the Administrator with any employee for poor work performance, attitude, work relationship with others, or other objectionable actions which are in conflict with the regulations set forth in this handbook or with the norms and standards established in this agency.

The procedural steps will be as follows:

Step 1: A verbal warning will be given to the employee by the Administrator, and the incident will be recorded on the employee's record.

Step 2: A written warning will be prepared and given to the employee making it the first Disciplinary Action Record on file.

Step 3: The Administrator will prepare second and final Disciplinary Action Record—noting all pertinent incidents associated with and leading up to this step. The employee will then be DISCHARGED.

(Emphasis supplied). Following the hearing, the referee concluded Thurner had been discharged for misconduct, and a Commissioner's representative affirmed.

### ISSUE

Did the Commissioner erroneously conclude Thurner was discharged for misconduct?

### ANALYSIS

 1. An employee who is discharged for misconduct is disqualified from receiving unemployment compensation ben-

efits. Minn.Stat. § 268.09, subd. 1(2) (1986). The employer has the burden of proving by the greater weight of the evidence that the employee's actions constituted misconduct. *Lumpkin v. North Central Airlines, Inc.*, 296 Minn. 456, 459, 209 N.W.2d 397, 400 (1973). "Misconduct" is defined as follows:

> [T]he intended meaning of the term "misconduct" * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct."

*Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973).

Whether an employee's behavior constitutes misconduct is a legal question which may be independently reviewed by this court. *Dean v. Allied Aviation Fueling Co.*, 381 N.W.2d 80, 83 (Minn.Ct.App.1986); *see Smith v. Employers' Overload Co.*, 314 N.W.2d 220, 221 (Minn.1981). However, we defer to findings of fact issued by the Commissioner's representative. *Cary v. Custom Coach, Inc.*, 349 N.W.2d 331, 332 (Minn.Ct.App.1984).

■ 2. Thurner raises several problems with his employment at the Philip Chemical Dependency Center which might have supported a finding that he had good cause to quit; however, that is not the issue here. The parties agree Thurner was discharged and did not quit; therefore, the only question is whether he engaged in misconduct sufficient to disqualify him from the receipt of unemployment compensation benefits.

The Commissioner's representative concluded Thurner engaged in misconduct when he refused to make a change in his recordkeeping procedures in accordance with Philip's directions. The Commissioner's representative also noted this conduct followed previous arguments between Thurner and Philip.

3. Regarding Thurner's arguments over his paycheck, Philip testified he had previously requested Thurner to submit a written report on the smoking conference. In addition, Philip testified the argument in the reception area was overheard by patients. Since the argument could have interfered with Philip's business, the argument was not an isolated hotheaded incident. *Cf. Windsperger v. Broadway Liquor Outlet*, 346 N.W.2d 142, 145 (Minn. 1984) (isolated temper tantrum or single hotheaded incident does not amount to misconduct justifying denial of unemployment compensation benefits). "[T]here was no showing that Windsperger's isolated outburst disrupted the store * * *." The second argument on December 31 also cannot be excused under the isolated hotheaded incident exception to misconduct, since Thurner had left for two hours after the initial argument and upon his return had resumed his tirade. During those two hours, Thurner had the opportunity to calm down and evaluate the problem. The record also indicates Thurner argued with Philip about the method of maintaining patient files.

Philip's memo indicates Thurner walked out of the meeting on January 17 before it was completed, stating he would not do the smoking program or work with adolescents. This behavior also constituted misconduct under *Tilseth*.

4. Thurner introduced into evidence Philip's personnel manual, which provided for a three-step disciplinary procedure prior to discharge of an employee. In *Hoemberg v. Watco Publishers, Inc.*, 343 N.W.2d 676 (Minn.Ct.App.1984), this court held the employee's actions did not constitute misconduct because the employer had failed to

follow its disciplinary provisions contained in an employee's handbook. *Id.* at 678. The *Hoemberg* court stated:

> The employee handbook and its provisions are enforceable as part of the employment agreement. *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn. 1983). The provisions are more than mere general statements of policy—they are conditions of employment.

*Id.*

*Hoemberg* is distinguishable. Philip's personnel manual states the disciplinary steps set forth therein *"may* be taken * *."* (Emphasis supplied). We do not construe this language as the type of "condition of employment" contemplated by *Hoemberg.* Furthermore, the three disciplinary steps established in Philip's personnel manual were to be taken for "poor work performance, attitude, work relationship with others, or other objectionable actions * * *." This language does not encompass the misconduct displayed by Thurner, which was a more serious breach of his duties and obligations to Philip.

### DECISION

Given the deference we must give to the Commissioner's findings and conclusions, the Commissioner properly determined Thurner engaged in misconduct and is disqualified from receiving unemployment compensation benefits.

Affirmed.