**Alston M. STEINBACH, Plaintiff,**

v.

**NORTHWESTERN NATIONAL LIFE INSURANCE COMPANY, Defendant.**

Civ. No. 4-88-354.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 15, 1989.

Paul C. Sprenger, Paul Sprenger & Associates, Minneapolis, Minn., for plaintiff.

Thomas P. Kane, Marko Mrkonich, Peggy Gunn, Oppenheimer Wolff & Donnelly, Saint Paul, Minn., and Deborah Klein, Northwestern Nat. Life Ins. Co., Minneapolis, Minn., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff Alston M. Steinbach brings this action against defendant Northwestern National Life Insurance Company (Northwestern) alleging, in count 1, age discrimination in violation of the Age Discrimination in Employment Act (ADEA); in count 2, age discrimination in violation of the Minnesota Human Rights Act (MHRA); in count 3, wrongful discharge in violation of the public policy of the State of Minnesota; in count 4, breach of contract created by an employee handbook; and in count 5, defamation. Now before the court is Northwestern's motion for summary judgment on all counts.

### I.

Steinbach, currently age forty seven, was hired by Northwestern in 1977 as an electronic data processing manager in the internal audit department.[1] Steinbach's supervisor until 1983 was Archie Johnson who was Northwestern's second vice-president and auditor. Johnson consistently found Steinbach to be a competent and conscientious employee and maintained that Steinbach did well at organizing and completing audits in a timely fashion.

In 1983 Johnson took early retirement and recommended Steinbach to replace him as Northwestern's auditor because Johnson believed that Steinbach was the most qualified candidate for the position. Northwestern rejected Johnson's recommendation and hired Louise Neal to replace Johnson although she had thirteen fewer years of auditing experience than Steinbach.[2]

After Northwestern hired Neal, problems arose between Steinbach and Neal. According to Steinbach, the office atmosphere changed considerably because of Neal's attitude toward Steinbach. Neal showed favoritism toward younger employees in aspects of privileges and courtesies and treated the younger persons differently for purposes of expense reimbursement.

---

1. On a motion for summary judgment, the court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987).

2. Neal was age thirty one at the time she was hired to replace Johnson.

Northwestern did not inform Steinbach of the reason he was not offered the position. Steinbach contends that his age was the primary reason and that John Pearson, Northwestern's president and chief executive officer, inquired about his age early in his interview for the auditor position.

On at least one occasion, Neal discussed Steinbach's performance and the need to discipline him with Roger Weber.[3] Steinbach's younger co-workers also began treating him rudely and joked about the mental capabilities of older persons.

Neal first formally criticized Steinbach in his 1985 performance review, stating that Steinbach needed to make an effort to meet future target dates set for various audits. This was the first time that Steinbach had received such comments in a performance review. Prior to 1985, Steinbach had always received very good reviews. In the 1985 review, Neal did not criticize Steinbach for the quality of his work or his knowledge of the job, nor did she indicate that he was intellectually unable to perform the job or that he wasn't working hard enough. Her only critical comment involved the need to meet audit deadlines.

In the 1986 performance review, Neal gave Steinbach an overall average rating of 3.2 and rated Steinbach either as meeting or exceeding expectations in all categories.[4] She acknowledged that Steinbach had shown improvement in the completion of planned audits. As a result Steinbach received a 4.9% merit pay increase.

Despite Steinbach's apparent improvement, on May 5, 1987, Neal gave Steinbach a verbal warning about timeliness which she subsequently documented with a memorandum. Steinbach claims that the audits discussed in the memorandum were untimely because of the changes ordered by Neal. In any event, Steinbach attempted to rectify the problem by discussing the matter with Neal, but she refused to attempt to resolve the problem.[5]

During the months following May 1987, Steinbach undertook to address Neal's criticisms by working additional hours. Steinbach also checked with Neal weekly to discuss his progress and was assured he was performing satisfactorily.

On August 12, 1989, Steinbach received a written warning from Neal. The warning centered on Steinbach's apparent failure to provide Neal with target dates for certain tasks, but did not reprimand him for missing target dates.[6] Steinbach completed all the work projects discussed in the written warning by October 2, 1987. Nonetheless, on October 8, 1987, Neal terminated Steinbach without written explanation.[7]

According to Steinbach, Neal announced his termination to his colleagues at Northwestern by stating that he had been on probation and was terminated because of individual performance problems. Steinbach contends that in attempting to find subsequent employment, he has been compelled to disclose the stated reasons for his termination.[8]

Steinbach also alleges that his termination was motivated by a letter sent to Northwestern employees by Pearson describing the various "expense management programs" that would "impact payroll expenses that must necessarily be reduced." Neal was informed that her department would have to reduce its costs by $100,000. According to Steinbach, his termination cut over ten percent of the department's costs

---

3. Steinbach alleges that Neal and Weber had a close working relationship and suggests that this relationship contributed to the office atmosphere and disparate treatment. He also compares his performance to that of Weber in an effort to substantiate his charge of unequal treatment.

4. Northwestern's employee rating system is based on a five point scale, with three reflecting satisfactory performance and five being exceptional. Steinbach's average performance review rating during his tenure at Northwestern was 3.72.

5. In response to the verbal warning, Steinbach filed a complaint with the EEOC which charged, among other things, that Northwestern's untrue performance reviews about him were an attempt to inhibit his chance for promotion.

6. Steinbach filed another EEOC discrimination charge on October 1, 1987 claiming that some of the actions taken by Northwestern were because of his previous complaint to the EEOC.

7. Two months after Steinbach's termination, Neal promoted Weber to the position of director of internal audit. Weber was thirty years old at the time.

8. Steinbach's job was filled by a twenty-eight year old man named Tod Zacharias who was paid $36,400 per year. At the time of his dismissal, Steinbach made $48,800 per year.

without reducing the employee workforce. He alleges that this method of cost reduction was also utilized with other older employees.

## II.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Agristor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The non-moving party may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.,* at 322–23, 106 S.Ct. at 2552–53.

## III.

### A.

■ Northwestern moves for summary judgment on count 1 of the complaint

where Steinbach alleges that Northwestern terminated him because of his age in violation of the ADEA.[9] Like Title VII cases, ADEA cases generally utilize a three-step analysis process first articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), consisting of a prima facie case, an answer and a rebuttal. *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 289 (8th Cir.1982).

To establish a prima facie age discrimination case under the *McDonnell Douglas* test, the plaintiff must show:

(1) that he is within the protected age group;

(2) that he performed the job at a level that met the employer's legitimate expectations;

(3) that he was terminated from his job; and

(4) that he was replaced by a someone who provided the same service or skill.

*Raschick v. Prudent Supply, Inc.,* 830 F.2d 1497, 1499 (8th Cir.1987). If a plaintiff makes out a prima facie case, the defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Finally, if the defendant presents a legitimate explanation, the plaintiff has an opportunity to prove that the defendant's proffered reasons were a mere pretext for its true reasons. *Halsell,* 683 F.2d at 289.[10]

In this case, three of the four elements of the prima facie case are not in dispute. Steinbach is within the protected class of the ADEA because he is at least forty years of age, he was terminated, and he

---

**9.** The ADEA, 29 U.S.C. § 623, provides in pertinent part:

(a) Employer Practices
It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual ... because of such individual's age;
(2) to limit, segregate, or classify [its] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [the employee's] status as an employee, because of such individual's age; or
....

**10.** Recently, the Court of Appeals made clear that the *McDonnell Douglas* three-step process is not the exclusive method to establish a discrimination case. In cases where there is direct proof of discrimination, a plaintiff may establish a prima facie claim simply by showing that he was terminated because of age in violation of the ADEA. *Perry v. Kunz,* 878 F.2d 1056, 1061 (8th Cir.1989). After such a showing, the defendant must prove by a preponderance of the evidence that the termination would have occurred even in the absence of discrimination. *Id.* at 1059–60.

was replaced by a person who provided the same service or skill to Northwestern. *See Raschick*, 830 F.2d at 1499. The contested element is the second—whether Steinbach performed his job at a level that met Northwestern's legitimate expectations.

Northwestern claims that Steinbach was terminated for poor performance. It relies on the criticisms in Steinbach's performance reviews and the oral and written warnings Neal issued to Steinbach prior to his termination. Northwestern asserts therefore that Steinbach has failed to prove the second element of the prima facie case. This argument does not entitle Northwestern to summary judgment, however. *See Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1100 (8th Cir.1988) (jury should decide issue of job performance where fact questions exist regarding performance abilities even though part of prima facie case); *see also Neufeld v. Searle Laboratories*, 884 F.2d 335, 339 (8th Cir.1989) (jury finding that employee was not adequately performing job is not an ADEA defense if the jury believes age was the reason for the termination); *Raschick*, 830 F.2d at 1499 (production of factual evidence of good performance satisfies element of prima facie case).

Steinbach has produced evidence that he adequately performed his job as an auditor with Northwestern. His written evaluations consistently resulted in scores that demonstrate adequate performance. In his years of service prior to the hiring of Neal, he never received an unsatisfactory performance review. During his tenure at Northwestern, Steinbach's overall average performance rating exceeded the satisfactory level. His former supervisor, Johnson, found him to be a competent, highly qualified employee. When Johnson retired, he recommended Steinbach to replace him. Even Neal, the person who eventually terminated Steinbach, gave him a satisfactory performance review and a 4.9% merit based pay increase the year before the termination. These facts support Steinbach's position that he was adequately performing his job, thus he has come forward with adequate evidence to demonstrate a prima facie case. *See Washburn v. Kansas City*

*Life Ins. Co.*, 831 F.2d 1404, 1408–09 (8th Cir.1987).

Steinbach also presented evidence of what he alleged were Northwestern's age discrimination practices including affidavit testimony of other Northwestern employees who, like Steinbach, had consistently received good performance reviews until late in their careers. Steinbach submitted evidence that Northwestern favored younger employees, encouraged salary cuts—which tended to impact older, higher paid employees more than younger employees—as a method of department cost savings, and strongly advocated early retirement for many of the older employees. *See Washburn*, 831 F.2d at 1406, 1408–09.

Steinbach also submits that Neal sought to terminate him so that she could promote his younger colleague Weber. Steinbach alleges that the relationship between Neal and Weber is particularly relevant because Weber also missed deadlines on audits—the conduct that Northwestern claims formed the basis for Steinbach's termination—without any disciplinary action by Neal. *See Ridenour v. Montgomery Ward and Co.*, 786 F.2d 867, 868–69 (8th Cir.1986). After Steinbach was terminated, Neal promoted Weber. This evidence also supports an inference of age discrimination and can also serve to discredit the non-discriminatory reasons advanced by Northwestern.

The mere fact that Northwestern articulates a legitimate, non-discriminatory reason for Steinbach's termination does not entitle it to judgment in its favor. *Neufeld*, 884 F.2d at 339; *Halsell*, 683 F.2d at 292 & n. 6. Instead, to prevail on summary judgment, Northwestern must demonstrate that Steinbach has produced no evidence which suggests that age may have been the reason for his termination.

Steinbach has submitted evidence which, if believed by a jury, could support an determination that age was the reason he was discharged. This evidence can also prove that Northwestern's purported non-discriminatory reason for termination is nothing more than a pretext for age discrimination. *See Washburn*, 831 F.2d at

1408. These facts create jury issues, and summary judgment on the ADEA claim should be denied.[11]

### B.

■ Northwestern also moves for summary judgment on count 3 where Steinbach alleges wrongful discharge in violation of Minnesota's public policy against age discrimination in employment. *See* Minn.Stat. § 363.12 subd. 1(1). Northwestern contends that the MHRA is the exclusive remedy for age discrimination in employment in Minnesota.

To support his argument, Steinbach relies on a recent Minnesota Supreme Court case which created a cause of action for wrongful discharge in violation of public policy. *Phipps v. Clark Oil and Refining Corp.*, 408 N.W.2d 569 (Minn.1987). Steinbach's reliance on *Phipps* is misplaced.

In *Phipps* the court provided a cause of action for an employee who was terminated for refusing to dispense leaded gasoline into an automobile designed for unleaded fuel only. The articulated public policy found in the Clean Air Act, 42 U.S.C. § 7401–7642 (1983), and the related regulations, 40 C.F.R. § 80.1–.26 (1980), made it illegal to introduce leaded gasoline into a vehicle designed for unleaded gasoline. *Id.* at 571. Although the Clean Air Act provides a remedy for "whistleblowers"—people who violate the law as ordered and then report their employer—there is no remedy for people who refuse to violate the law. *Id.* The court provided the employee a cause of action under the common law to overcome this discrepancy and advance the purpose of the law. *Id.* There is no indication that the court intended to create a common law cause of action for the violation of every remedial statute.

A narrow reading of *Phipps* is supported by the fact that during the pendency of the appeal, the Minnesota legislature provided a statutory cause of action designed to protect employees against unjust terminations in similar circumstances. Because the legislature had acted the court "no longer [had] before [it] the policy question of whether or not Minnesota should [recognize] a cause of action for wrongful discharge...." *Id.* The *Phipps* court did not, as Steinbach argues, create a general cause of action for wrongful discharge.

Steinbach has alleged an age discrimination claim under the MHRA that can vindicate him if he prevails at trial. The MHRA's broad remedial provisions were intended to accomplish that result. *See Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Employees, Lodge 364 v. State*, 303 Minn. 178, 229 N.W.2d 3 (1975). Steinbach's common law claim for wrongful discharge duplicates his MHRA claim and thus should be dismissed.

### C.

Count 4 alleges breach of contract based on Northwestern's employee handbook provisions regarding employment policies and termination procedures. Steinbach contends that this handbook and an internal office memorandum directing supervisors to apply its policies created a contract for employment. Steinbach argues that Northwestern breached this alleged contract by terminating him without following the handbook procedures.

■ An employee handbook can create a unilateral contract only if the offer is definite in form and is communicated to the employee. *Pine River State Bank v. Mettile*, 333 N.W.2d 622, 626 (Minn.1983).[12] Whether the proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the par-

---

**11.** Steinbach also alleges age discrimination in violation of the MHRA. Neither party specifically addressed this issue, but Minnesota follows established federal law on discrimination claims. *See Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). For the same reasons that summary judgment is inappropriate on Steinbach's ADEA claim, summary judgment should be denied on the MHRA age discrimination claim.

**12.** There must also be acceptance and consideration to support the unilateral contract. *Pine River*, 333 N.W.2d at 626–27. These elements are generally satisfied if the employee continues to work for the employer. *Id.* at 627.

ties, not by their subjective intentions. *Id.* An employer's general statements of policy, however, do not meet the contractual requirements. *Id.*

▮ The language in the handbook in this case is insufficient to form an offer for a unilateral employment contract.[13] Throughout the handbook Northwestern repeats its intent by stating "[t]he goal of the Progressive Disciplinary Guidelines is improved performance." More importantly, however, the handbook contains an exceptions clause which states:

some conduct can result in immediate suspension.... Management is the sole and final determiner of whether conduct warrants immediate termination. In addition, The company must and does retain the right to terminate employment for any reason ...

and a terminations clause which provides:

it is important that all employees understand the terms and conditions of their employment status with The Company. We are not in a position to guarantee or promise employment for any specified length of time. As an employee you have the right to terminate your employment at any time. The Company retains the same right, regardless of any oral statements or promise to the contrary by any representatives of The Company.

The handbook language, instead of creating a definite offer for a unilateral contract, makes clear through the exceptions and terminations provisions that no contract is intended or offered. *See Audette v. Northeast State Bank*, 436 N.W.2d 125, 127 (Minn.Ct.App.1989).

▮ Steinbach claims that the handbook was modified by an inter-office memorandum which mandated the use of the handbook procedures. According to Steinbach, the company's requirement that the disciplinary procedures be followed overrides the disclaimers contained in the handbook.

Northwestern contends that the inter-office memorandum was never communicated

to its employees and thus, cannot modify its handbook. *See Skramstad v. Otter Tail County*, 417 N.W.2d 124, 126 (Minn. Ct.App.1987) (access to written personnel policy of county not sufficient communication); *Tobias v. Montgomery Ward & Co.*, 362 N.W.2d 380, 382 (Minn.Ct.App.1985) (copy of policy manual issued to personnel managers for their use did not constitute communication of offer).

Steinbach has not offered sufficient evidence that would support a finding that the inter-office memorandum was communicated to company employees other than supervisors. This limited distribution cannot constitute communication of an offer under Minnesota law. Without modification, the language of the handbook is insufficient to form the basis of a unilateral contract and Northwestern's motion for summary judgement on the breach of contract claim should be granted.

### D.

Count 5 alleges defamation as the result of Steinbach's termination. Steinbach claims that he was defamed by statements made to his co-workers after his termination and compelled self-publication of the defamatory information in subsequent employment interviews. Northwestern argues that Steinbach has failed to allege sufficient facts to support a defamation claim.

▮ To prevail on a claim of defamation, Steinbach must show that the alleged defamatory statements were communicated to someone other than himself, that the statements were false, and that the statements tended to harm his reputation and to lower him in the estimation of the community. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). Defamation that affects the plaintiff in his business, trade or profession is defamation *per se* and is actionable without proof of actual damages. *Id.* True statements, however disparaging, are not actionable. *Id.*

---

**13.** The resolution of whether the language in the handbook rises to the level of a contract is for the court. *Hunt v. IBM Mid America Employees*

*Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn. 1986).

Minnesota also recognizes defamation based on the doctrine of compelled self-publication. *Lewis v. Equitable Life Assurance Soc'y. of the United States,* 389 N.W.2d 876, 888 (Minn.1986). This doctrine applies to satisfy the publication requirement if circumstances compel the defamed person to disclose the alleged defamatory statement to a third person and the originator of the statement could have foreseen such compulsion. *Id.*

 Steinbach argues that he was defamed both by Northwestern's direct statements and by compelled self-publication. The direct statements, according to Steinbach, occurred shortly after the termination when Neal informed Weber and others that Steinbach had been on probation and was terminated for poor performance. The self-publication allegedly occurred when Steinbach was asked to explain the circumstances of his termination at an interview with Pillsbury Company. These allegations satisfy the first element of a defamation claim.

Likewise, Steinbach has produced sufficient facts to dispute whether the alleged defamatory statements are true. In an employment defamation case, the truth or falsity issue goes to the underlying statement, in this instance, whether Steinbach performed his job poorly. *Lewis,* 389 N.W.2d at 888–89. As discussed above, Steinbach has advanced adequate evidence to create a triable issue on this question.

Northwestern insists, however, that its statements were qualifiedly privileged because they arose out of the employer/employee relationship. Minnesota law recognizes a qualified privilege under these circumstances if the employer made the statements in good faith and for a legitimate purpose. *Lewis,* 389 N.W.2d at 889.

To rebut the qualified privilege, Steinbach must show Northwestern acted with actual malice. *Id.* at 890. Actual malice in the employment defamation context exists where the defendant "made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." *Stuempges,* 297 N.W.2d at 257.

Steinbach has presented evidence of possible age discrimination that, if believed by the jury, may constitute an improper motive for the alleged statements about his termination. Steinbach must also demonstrate sufficient evidence of ill will or intent purposely to injure him by the employment decision. It is not enough, of course, that he was injured by Northwestern's action.

To avoid summary judgment, Steinbach must show evidence that Northwestern acted with a spiteful or malevolent design. On this record, it appears that Steinbach has raised sufficient facts to create a jury issue. Consequently, summary judgment as to count 5 should be denied.

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings, IT IS HEREBY ORDERED that:

1. The motion of Northwestern National Life Insurance Company for summary judgment on counts 1, 2 and 5 is denied.

2. The motion of Northwestern National Life Insurance Company for summary judgment on counts 3 and 4 is granted, and those counts are dismissed with prejudice.