[No. 22938-9-I.   Division One.   February 14, 1990.]

JANICE DARLENE HIBBERT, *Appellant,* v. CENTENNIAL
VILLAS, INC., *Respondent.*

RINGOLD, J. Pro Tem., dissents by separate opinion.

*Jean Schiedler–Brown*, for appellant.

*Larry Halvorson* and *James C. Webber* (of *Davis Wright Tremaine*), for respondent.

WEBSTER, J.—Janice Darlene Hibbert appeals a summary judgment in favor of Centennial Villas, Inc., her employer, dismissing her action for breach of contract and wrongful discharge.

## FACTS

Hibbert began working as a night nurse at a Centennial Villas nursing home in February 1983. She received an employee handbook and optional grievance procedure after a 2–week orientation.

The grievance procedure declares, "Centennial Villas, Inc., operates under the principle that employment is terminable–at–will by the employee or the employer". The introduction to the handbook states, "Centennial Villas, Inc., retains the right to amend, modify, or revoke at any time privileges, policies, and procedures specified in this handbook." The handbook grants a right of severance pay to employees terminated without cause. "Employees who are terminated 'for cause' are not entitled to separation pay". The handbook lists specific conduct constituting cause for termination under a section entitled "Dischargeable Offenses". At the end of the list is a statement that Washington and California "retain the terminable–at–will

doctrine by which an employer can terminate an employee without cause".

Hibbert read the handbook and understood most of it. She signed a statement of understanding on February 23, 1983:

I certify that I have read, understood and will abide by all rules, regulations, directives and policies contained in the Centennial Villas, Inc. Employee Personnel Policies, a copy of which has been provided to me.

She understood that Centennial Villas could change its policies at any time. She heard and understood verbal representations that the policies were not to be understood as an employment contract. She signed a statement of understanding in June 1983, certifying this:

I also understand that the statements of policy contained in the Personnel Policies are not a contract nor are they to be interpreted as a covenant of employment and [they] may be changed without notice. I also understand that my employment can be terminated with or without cause and with or without notice at any time by me or [Centennial Villas] and that no facility representative has authority to enter into any agreement contrary to the foregoing.

Hibbert signed a third statement in July 1983, which added:

I also understand the Personnel Policies are guidelines only and may be changed by [Centennial Villas] at any time when in the judgment of [Centennial Villas] circumstances so require.

Hibbert allegedly performed her duties satisfactorily through November 1984. Some time before then, she discovered that the front and back doors of the nursing home would not lock properly. She informed the director of nursing services and a maintenance supervisor. Later, she found a foreign substance in a patient's ointment. It appeared to be plastic or glass. Hibbert noted the substance on a chart distributed to nurses and the director. Hibbert allegedly found glass or plastic in another container of ointment, but she never reported this to anyone.

In late November and early December 1984, Hibbert received notice of four work–related infractions. She was

accused (1) of not cooperating with a co–worker, (2) not giving medications as prescribed, (3) violating narcotics control procedures by counting drugs alone, and (4) not completing bandage dressings. Centennial Villas fired Hibbert on December 10, 1984, citing these four infractions as evidence of carelessness and disregard for patient safety.

## EMPLOYEE HANDBOOK

■ Hibbert argues that the employee handbook created an employment contract whereby she could be terminated only for cause. Generally, employment of indefinite duration is terminable at will by either the employee or employer. *Roberts v. ARCO,* 88 Wn.2d 887, 894, 568 P.2d 764 (1977). Two exceptions exist in the case of employee handbooks or personnel policy manuals. *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 685 P.2d 1081 (1984). First, handbooks or manuals may create an express contract to terminate only for cause.

> Under this approach the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties.

*Thompson,* at 228. Second, and independent of contractual analysis,

> if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

*Thompson,* at 230. Under the latter theory, it is necessary that "employees *justifiably rely* on the expressed policies" in order to expect a change in the terminable–at–will relationship. *Thompson,* at 230, 233; *Grimes v. Allied Stores Corp.,* 53 Wn. App. 554, 768 P.2d 528, *review denied,* 112 Wn.2d 1025 (1989).

Here, there is no evidence of an express contract changing the terminable–at–will relationship. To the extent the

parties expressly agreed on anything, they agreed that Hibbert's employment was terminable at will. Nor is there an implied contract changing the at–will status. An express agreement affirming the terminable–at–will relationship precludes a party from claiming an implied contract to the contrary. *See St. Yves v. Mid State Bank,* 111 Wn.2d 374, 379, 757 P.2d 1384 (1988); *Grimes; see also Messerly v. Asamera Minerals, (U.S.) Inc.,* 55 Wn. App. 811, 780 P.2d 1327 (1989) (at–will employment language and disclaimer of contract provision sufficiently conspicuous when contained in handbook introduction); *cf. Swanson v. Liquid Air Corp.,* 55 Wn. App. 917, 781 P.2d 900 (1989) (terminable–at–will handbook provision modified by management's *express* agreement to give truck drivers one warning before firing, inducing drivers not to seek union representation).

## WRONGFUL TERMINATION

Hibbert next argues that she was discharged in violation of public policy. The public policies allegedly violated are those against abuse and neglect in nursing homes, unsafe work places, and Medicare fraud.

■ Employees may sue in tort for wrongful discharge when an employer dismisses them for a reason that violates a clear mandate of public policy, either legislatively or judicially recognized. *Thompson,* at 232. The Legislature has declared a policy against abuse or neglect in nursing homes. *See* RCW 26.44, 18.51, 70.124, 74.42. We disregard the other policies because the one against Medicare fraud is premised on deliberate abuse and neglect, and the one against unsafe workplaces does not support a common law claim for wrongful discharge. *See Jones v. Industrial Electric–Seattle, Inc.,* 53 Wn. App. 536, 768 P.2d 520 (1989) (statutory cause of action for retaliatory termination under RCW 49.17.160(2) is exclusive remedy).

■■ The remaining inquiry is whether Centennial Villas terminated Hibbert because she reported malfunctioning doors and the presence of glass or plastic in a patient's ointment. Wrongful discharge is an intentional

tort. *Cagle v. Burns & Roe, Inc.,* 106 Wn.2d 911, 916, 726 P.2d 434 (1986). Accordingly, there must be evidence to support an inference of intent to discharge for a reason that violates public policy. Centennial Villas articulated legitimate reasons for terminating Hibbert. Therefore, she had the burden of showing that those reasons were a mere pretext—*i.e.,* that there was a conspiracy to prevent the exposure of abuse or neglect at Centennial Villas's nursing home. *See Baldwin v. Sisters of Providence in Wash., Inc.,* 112 Wn.2d 127, 136, 769 P.2d 298 (1989) (adopting the burden of proof formula applied in discrimination cases).

The fact that on one occasion facility doors did not lock properly does not raise an inference of willful neglect for patient safety. The isolated presence of glass or plastic in a patient's ointment is also insufficient to prove willful abuse. Hibbert did not treat the matter as anything other than an isolated and unintentional incident. She never reported a second finding to anyone. This is not a case, such as *Thompson,* where the employer failed to articulate legitimate reasons for a termination. Accordingly, Hibbert's burden is greater than was the plaintiff's in *Thompson. See Baldwin.* She has not sustained it. *See Grimwood v. University of Puget Sound, Inc.,* 110 Wn.2d 355, 364–65, 753 P.2d 517 (1988) (defendant articulated substantial reasons, including written ones and ones describing objective events; plaintiff's conclusory response failed for lack of specificity).

Affirmed.

FORREST, J., concurs.

RINGOLD, J.* (dissenting)—I respectfully dissent. The majority misperceives the scope and impact of *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 685 P.2d 1081 (1984), and misconstrues the holdings of subsequent cases. Given the confused state of affairs in this area of law, the majority's decision is not surprising. A historical review of the

---

*Judge Solie M. Ringold is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 26.

applicable cases and their holdings, however, is helpful in illuminating the basis for this confusion.

With the publication of *Thompson,* Washington joined a long list of states that were signaling the death of the doctrine of at-will employment under a variety of theories.[1] In *Thompson,* the trial court granted a summary judgment in favor of the employer dismissing the action for wrongful discharge of the employee. Justice Brachtenbach, writing for a unanimous court, recognized the various theories whereby the judicial system has ameliorated the harshness of the rule permitting discharge of employees at will and noted:

> A second contractual approach adopted by a number of courts is that the employer's right to terminate an at will employee can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees. Under this approach the requisites of contract formation, offer, acceptance

---

[1]An article in the National Law Journal notes that "[m]ore than two-thirds of American jurisdictions have abandoned the employment-at-will doctrine as a strict formulation." The National Law Journal, Jan. 20, 1986, at 6, cols. 2 and 3. Based upon information contained in *Employee Dismissal Law and Practice* by Professor Henry Perritt, Jr. (1984), the article contains the following alphabetical listing of states and the exceptions to the employment-at-will doctrine that they recognize: Alabama—implied contract; Alaska—implied contract; Arizona—implied contract; Arkansas—implied contract; California—covenant of good faith; Colorado—none; Connecticut—public policy tort; Delaware—none; District of Columbia—implied contract, no public policy tort; Florida—none; Georgia—none; Hawaii—public policy tort; Idaho—public policy tort; Illinois—implied contract; Indiana—implied covenant; Iowa—none; Kansas—public policy tort; Kentucky—implied contract; Louisiana—none; Maine—implied contract; Maryland—public policy tort; Massachusetts—implied covenant; Michigan—implied contract; Minnesota—implied contract; Mississippi—none; Missouri—implied contract; Montana—implied covenant; Nebraska—implied contract, no public policy tort; Nevada—implied contract; New Hampshire—public policy tort; New Jersey—implied contract; New Mexico—implied contract; New York—implied contract, no public policy tort; North Carolina—public policy tort; North Dakota—implied covenant; Ohio—implied contract, no public policy tort; Oklahoma—implied contract; Oregon—implied contract; Pennsylvania—implied contract; Rhode Island—none; South Carolina—public policy tort; South Dakota—implied contract; Tennessee—public policy tort; Texas—implied contract; Utah—none; Vermont—none; Virginia—implied contract; Washington—implied contract; West Virginia—public policy tort; Wisconsin—implied contract, contract action permitted based on public policy violations but not tort action; Wyoming—implied contract.

and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties. *See, e.g., Pine River State Bank v. Mettille,* [333 N.W.2d 622 (Minn. 1983)]; *but see Rosellini v. Banchero,* 83 Wn.2d 268, 517 P.2d 955 (1974) (modification requires consideration in addition to that promised in original contract). We agree with these cases that an employee and employer can contractually obligate themselves concerning provisions found in an employee policy manual and thereby contractually modify the terminable at will relationship.

Independent of this contractual analysis, however, we hold that employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees. When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule.

However, absent specific contractual agreement to the contrary, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship. Thus, the employer's reason for unilaterally issuing an employee policy manual or handbook, purporting to contain the company policy vis–a–vis employee relations, becomes relevant.

We are persuaded that the principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security for their employees. *See, e.g., Parker v. United Airlines, Inc.,* 32 Wn. App. 722, 726–27, 649 P.2d 181 (1982).

While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. . . . It is enough that the employer chooses, presumably in its own interest, to create an environment in which

the employee believes that, whatever the personnel policies and practices . . . [the policies] established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "*instinct with an obligation*".

(Italics ours.) *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 613, 292 N.W.2d 880 (1980). It would appear that employers expect, if not demand, that their employees abide by the policies expressed in such manuals. This may create an atmosphere where employees *justifiably rely* on the expressed policies and, thus, justifiably expect that the employers will do the same. Once an employer announces a specific policy or practice, especially in light of the fact that he expects employees to abide by the same, the employer may not treat its promises as illusory.

Therefore, we hold that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship. We believe that by his or her unilateral objective manifestation of intent, the employer creates an expectation, and thus an obligation of treatment in accord with those written promises. *See* Restatement (Second) of Contracts § 2 (1981) (promise is a manifestation of intention *to act or refrain from acting in a specified way,* so made as to justify a promise in understanding a commitment has been made).

(Some citations omitted.) *Thompson,* at 228–30.

The court noted that there was "no formalized agreement concerning appellant's employment relationship with St. Regis." *Thompson,* at 223. The opinion reviewed the materials submitted on the motion for summary judgment in the light most favorable to the employee and stated that:

Initially, the record reveals that St. Regis issued an employee Policy and Procedural Guide manual. On this record we are unable to determine the effect of the manual in relation to the employment relationship; whether any statements therein amounted to promises of specific treatment in specific situations; if so, whether the appellant justifiably relied on any of those promises; and finally, whether any promises of specific treatment were breached. These questions present material issues of fact.

*Thompson,* at 233. The summary judgment was reversed and the case remanded. *Thompson,* 234–35.

In *Brady v. Daily World*, 105 Wn.2d 770, 718 P.2d 785 (1986), the Supreme Court again considered the propriety of the trial court's dismissal of an employee's wrongful discharge claim. Brady had been employed as a pressman at defendant's newspaper for 32 years before he was terminated. Although there was no explicit contract of employment signed by the parties at the time of hiring, the employee alleged an express or implied contract to discharge only for good cause based upon statements found in a personnel handbook he had received 8 years earlier. *Brady*, at 771. Brady specifically noted the handbook section that stated:

DISMISSAL FOR CAUSE

When an employee joins the company, we hope he/she will be associated with us for a long time. Unfortunately, some employees do not meet the standards of conduct and performance which we expect. If this happens, it may become necessary to effect a termination.

Any decision which requires such action is made only after careful consideration of all known facts. Any of the following may be considered sufficient grounds for dismissal.

. . .

Intoxication or drug abuse.

. . .

An employee dismissed for cause forfeits all privileges and benefits.

*Brady*, at 772.

In deciding the case, the *Brady* court first concluded that *Thompson* would be applied retroactively since the case had been stayed in the Court of Appeals pending the outcome of *Thompson. Brady*, at 774–75. The court then considered the propriety of the grant of summary judgment. Justice Brachtenbach, again writing for a unanimous court, noted that in light of the posture of the case, the court must view the evidence and inferences in the light most favorable to the employee. In so doing, the court concluded that

[t]he personnel handbook refers to dismissal for cause after careful consideration of all known facts. Whether any of these policies amounted to promises of specific treatment in specific situations, and if so, whether plaintiff justifiably relied upon any of these promises are questions of fact which remain to be proven.

*Brady,* at 775. The case was reversed and remanded for trial on that issue. *Brady,* at 777.

In *Adler v. Ryder Truck Rental, Inc.,* 53 Wn. App. 33, 765 P.2d 910 (1988), *review denied,* 112 Wn.2d 1013 (1989), the plaintiff sued his employer for wrongful discharge. Adler had been hired as a night shift mechanic in Seattle. Although there was no written contract of employment, he was told at the time that he would be on probation for 6 months with either party being able to terminate the employment at will. Adler successfully completed his probation and was eventually promoted to a supervisory position. Two years later, he received a written warning for failure to properly install wheel hubs and studs. On the bottom of the warning was written:

COMPANY POLICY ON DISCIPLINARY PROCEDURE
A system of progressive discipline is used at Ryder. A First Offense will result in a documented verbal warning with a notice put in your personnel file. A Second Offense will result in a written warning to be signed by the employee and supervisor and put into your personnel file. A Third Offense will carry a disciplinary action of three days off without pay and again a signed warning put into your personnel file. A Fourth Offense requiring discipline will result in discharge. Serious offenses will result in immediate discharge.

*Adler,* at 34.

Subsequently, Adler became aware of an opening with Ryder in Yakima. He applied for and received the transfer. He moved to Yakima and was terminated without notice 9 months later. After hearing evidence, the trial court dismissed Adler's wrongful discharge claim on Ryder's motion for directed verdict. *Adler,* at 35.

On appeal, the court stated:

In this case, the personnel manual does not create any specific expectations for employees with respect to termination because the manual was written specifically for supervisory personnel. In addition, it was subject to change without notice and specifically stated the provisions in it were not binding on any employment contract. However, this court is not limited to examination of the personnel manual.

*Adler,* at 36. The court then noted that Adler had stated that he understood that termination was to be for cause

only and that he was "trained as a supervisor that discharge would be for cause." *Adler,* at 37. The written warning Adler received also stated that discharge would be for cause only and the policy was well known among Ryder employees. Considering all these facts in the light most favorable to the nonmoving party, the court concluded that Adler had presented a prima facie case of wrongful discharge and reversed the judgment of the trial court. *Adler,* at 37.

Here, as in *Thompson,* there is no formalized agreement concerning Hibbert's employment with Centennial Villas. She received the employee policy manual and grievance procedure data after a 2–week work orientation period. The manual provides:

**G. Termination**

When, for any reason, an individual's employment is terminated by the facility, the employee will be interviewed by a supervisor and/or the Administrator prior to issuance of the employee's final paycheck. The interview is conducted to explain to the employee the reason(s) for the termination. Employees who are terminated "for cause" are not entitled to separation pay as outlined in Section II, H–4 of this booklet.

All payroll checks for terminated employees will be available at the facility on the next scheduled payday unless otherwise specified by state law.

**H. Employee Benefits**

Benefits vary according to your job classification and are generally transferable between departments and to other facilities within the corporation, provided that you are entitled to such benefits as determined by the Administrator.

**1. Transfers**

An employee transfer between departments within the facility or between facilities in the corporation can be offered only when both affected supervisors and the Administrator(s) agree(s) to such a move. Transfers may be executed at the employee's request and expense, provided the following conditions are met:

a. An acceptable level of performance has been maintained during the immediate past employee evaluation period.

b. There is a bona fide job opening for which the potential transferee qualifies.

c. A transfer request is submitted at least two (2) weeks in advance of the proposed transfer.

**2. Vacation Benefits**

All unlicensed hourly employees who work on a predetermined schedule will be granted vacation pay as calculated from their employment anniversary date as follows:

After 1 year of continuous service . . . 8 hours vacation pay for each 400 hours worked.

After 2 years of continuous service . . . 8 hours vacation pay for each 300 hours worked.

After 3 and 4 years of continuous service . . . 8 hours vacation pay for each 200 hours worked.

After 5 years of continuous service and each year thereafter . . . 8 hours vacation pay for each 164 hours worked.

All licensed hourly employees who work on a predetermined schedule will receive 8 hours vacation pay for each 200 hours worked after one year of continuous service. After 5 years of continuous service the vacation benefit is 8 hours vacation pay for each 138 hours worked in the previous year.

Employees will receive vacation pay at their hourly straight time pay rate effective at the time vacation pay eligibility occurs (on their employment anniversary date).

All employees who work on a monthly salary basis will receive two (2) weeks paid vacation per year after one year of continuous service. After 5 years of continuous service and each year thereafter the vacation benefit is three (3) weeks paid vacation per year.

Vacation benefits must be used before completing a subsequent year of employment and do not accure [sic] from year to year.

**3. Holiday Benefits**

The following are observed by Centennial Villas as paid holidays:

a. New Year's Day

b. Memorial Day

c. Independence Day

d. Labor Day

e. Thanksgiving Day

f. Christmas Day

g. Employment Anniversary Date (Effective 1–1–82)

All Regular employees who are not scheduled to work on a recognized holiday will receive holiday pay at their regular rate of pay in accordance with the following schedule, provided that they have worked on the last scheduled work day before the holiday and the first scheduled work day after the holiday. (All employees must have been employed for a minimum of 90 consecutive calendar days to be eligible for "a" thru "f" and 365 consecutive calendar days for "g". The employment anniversary holiday may be scheduled within a 30 day period following eligibility as mutually agreed upon by employee and supervisor.

| Hours worked per holiday pay period | Holiday benefit |
|---|---|
| 8 – 20 | 2 hours pay |
| 21 – 40 | 4 hours pay |
| 41 – 60 | 6 hours pay |
| 61 and over | 8 hours pay |

An exception to this policy provides that any eligible employee who is on approved vacation on a recognized holiday will receive holiday pay in addition to vacation benefits.

All employees who are required to work on any of the recognized holidays will be paid at two (2) times their straight time rate of pay for all approved work hours.

An unexcused absence from scheduled work on a recognized holiday will result in a loss of holiday pay benefits for that holiday.

The manual continues with a provision regarding separation pay and insurance benefits which indicates that "after the 90 day conditional employment period, insurance programs are available for all full–time employees." It also contains leave of absence provisions providing that after leave of absence "the facility will generally make an effort to return the employee to the same position and pay level." The manual goes on to provide a grievance procedure:

### O. Employee Grievances

It is the intent of Centennial Villas, Inc. to try to do what is fair and right at all times in our day–to–day relations with our employees. To that end we urge you to bring your complaints or problems to us and to expect that they will receive prompt consideration and fair settlement. The following procedures will govern the airing of an employee grievance:

First, if you have a complaint or problem at work, discuss it with your supervisor. (If your grievance concerns your immediate supervisor to the degree that you are reluctant to discuss it with him or her, talk to your department head instead.) Your supervisor will investigate your complaint or request and generally give you a response within seven (7) calendar days. If that response seems unreasonable or is not satisfactory to you, ask to see your department head about the matter.

The department head will discuss the matter with you, investigate your complaint or consider your request, and usually give you a response within seven (7) calendar days of your discussion. If that response seems unreasonable or is not satisfactory to you, request that the department head assist you in preparing a written version of your complaint or request and forward it promptly to the Administrator.

The Administrator will discuss with you, investigate, review, and generally respond in writing to your complaint or request within ten (10) calendar days of its receipt. If you wish, you may ask your department head to attend your conference with the Administrator. The Administrator's decision in the matter will be final.

If, at any step in this procedure, additional time is needed to permit more detailed investigation or review, you will be notified as to the reason and projected length of delay.

This grievance procedure is available to any employee for any purpose at any time, provided that a discharged employee must initiate the grievance procedure within seven (7) calendar days following his/her termination.

The personnel policy manual continues with a paragraph as follows:

### Y. Dischargeable Offenses

Any of the following breaches of conduct will constitute "discharge for cause" and will result in the dismissal of the employee concerned.

1. Substantiated abuse or inconsiderate treatment of residents.
2. Failure to comply with facility procedures for reporting substantiated or suspected patient abuse or inconsiderate treatment of residents.
3. The drinking of alchoholic [sic] beverages or being under the influence of such while on duty.
4. Abuse or suspected abuse of legal or illegal drugs or substances.
5. Any theft, failure to report theft, or concealment of theft.
6. Chronic tardiness or unexcused absenteeism.
7. Violation of a resident's privacy by the unauthorized release of confidential information.
8. Insubordination.
9. Failure to comply with employee health policies.
10. Altercations or fighting on facility premises.
11. Immoral, indecent, or other questionable conduct which occurs on or off facility premises and is discreditable to the facility.
12. Soliciting or accepting tips or gifts from residents or visitors.
13. Issuing unauthorized medical advice.
14. Subjection to three garnishments within a one year period. (Refer also to Wage & Salary).
15. Alteration or removal of a time card from the facility.
16. Clocking in or out for another employee.
17. Sleeping on duty.
18. Malicious gossip or slander.

> All other recommended discharges for any other offenses will be reviewed by the Administrator before a discharge can be effected.
>
> The states of Washington and California retain the terminable–at–will doctrine by which an employer can terminate an employee without cause as long as the termination if [*sic*] for no discriminatory reason.

In a separate document the company also furnished Hibbert a more specific employee grievance procedure and a separate chart outlining the procedure. It should be noted that the final paragraph of the dischargeable offenses provision does not clearly indicate that Centennial intended its employees to remain terminable at will and is not a completely accurate statement of the law. Both Washington and California cases have in fact held that even though initial employment was at will, that good cause may be required for termination. *See, e.g., Thompson; Cleary v. American Airlines, Inc.,* 111 Cal. App. 3d 443, 168 Cal. Rptr. 722 (1980).

Despite all the representations made to Hibbert, the majority handily disposes of her contract claim by simply stating that "[a]n express agreement affirming the terminable–at–will [employment] relationship precludes a party from claiming an implied contract to the contrary." Majority, at 892–93 (citing *St. Yves v. Mid State Bank,* 111 Wn.2d 374, 379, 757 P.2d 1384 (1988)). This conclusion misapplies the holding of *St. Yves* and misconstrues the facts here.

In *St. Yves,* the employee was hired as the president and chief executive officer of Mid State Bank pursuant to a *written employment agreement. St. Yves,* at 375. The unambiguous terms of this written agreement affirmed the at–will nature of the employment, so the court concluded that parol evidence was inadmissible to alter its terms. *St. Yves,* at 378. The existence of this written employment contract was relied upon to distinguish the case from both *Thompson* and *Brady. St. Yves,* at 379. Here, as the majority acknowledges, there was "no evidence of an

express contract changing the terminable–at–will relationship." Majority, at 892. There was, likewise, no express contract establishing a terminable–at–will relationship as in *St. Yves*. To apply the holding of *St. Yves* to the case at bar effectively ignores the significance accorded to the existence of the express employment contract by the *St. Yves* court and eviscerates both *Thompson* and *Brady*.

Inexplicably, neither counsel for Centennial Villas nor the majority here have referred to *Stewart v. Chevron Chem. Co.*, 111 Wn.2d 609, 762 P.2d 1143 (1988), even though the majority opinion in *Stewart* appears to overrule *Thompson sub silentio*. In *Stewart*, an employee of Chevron sued for wrongful discharge. A jury awarded the employee damages on the theory that Chevron breached a provision of its policy manual in discharging the employee. *Stewart*, at 610–11. On appeal, the Supreme Court held that interpretation of a writing is a question of law for the court. The court then concluded that the manual provision in issue did not create a binding promise and the judgment was reversed. *Stewart*, at 614–15.

The *Stewart* majority takes a 180 degree turn from the rationale and direction articulated by the court in *Thompson*. As stated by Justice Dore in his dissenting opinion (concurred in by Pearson, C.J.) the *Stewart* majority ignores the teachings of *Thompson*.

> In *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984), this court held that provisions contained in an employee handbook or manual may be considered binding terms of an at–will employment contract. An employer may be bound by provisions contained in an employee handbook if
>> an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.
>
> *Thompson*, at 230. Whether an employee handbook provision is a promise of "specific treatment in specific situations" is a question of fact. *Thompson*, at 233; *accord, Brady v. Daily World*, 105 Wn.2d 770, 775, 718 P.2d 785 (1986). The jury was

instructed on this issue and it found that Chevron intended to be bound by the personnel provisions contained in its manual. *Stewart,* at 615–16.

The majority sought to resolve the issue by resorting to a supertechnical contract analysis. It chooses to ignore the ambiguities created by Chevron's manual and the circumstances of Stewart's employment. Given the court's holding in *Stewart,* it is difficult to understand why the Supreme Court denied review of *Adler.*

Most recently, in *Swanson v. Liquid Air Corp.,* 55 Wn. App. 917, 781 P.2d 900 (1989), *review granted and remanded to Court of Appeals,* 114 Wn.2d 1008 (1990) (in view of *St. Yves v. Mid State Bank, supra*), Division Two considered the propriety of a summary judgment dismissing a wrongful discharge claim. The plaintiff had been hired as a truck driver in 1983. At the time, no express employment contract was entered into, however, shortly thereafter, the plaintiff received an employee benefits manual. The manual contained a disclaimer which stated:

DISCLAIMER STATEMENT

The Company may revise or discontinue policies, procedures or benefits described in this handbook and/or institute new policies, procedures or benefits. Neither this handbook nor any other Company policies, procedures or practices (whether verbal or written) or the acceptance or continuance of employment is to be construed as a contract of employment (which can only be authorized by the President or Executive Vice–President), a promise of continued employment, or as creating an implied or contractual duty between an employee and the Company. To the contrary, all employment can be terminated by the employee or by the Company for reasons which either the employee or the Company, as the case may be, considers sufficient.

*Swanson,* at 918.

In 1985, the plaintiff received a memorandum of working conditions that contained provisions on topics including seniority, work hours and vacation time. It also included a provision which stated:

WORK RIGHTS

Dishonesty, drinking or use of drugs on duty, recklessness resulting in an accident, or the carrying of unauthorized

passengers shall be deemed sufficient and proper cause for discharge without prior notice. *In all other instances of misconduct, at least one warning, shall be given.* A new employee shall be on a ninety (90) day trial basis, during which period he may be discharged without prior notice.

*Swanson,* at 919. Plaintiff stated in an affidavit that the manager of labor relations told the drivers that the memorandum ""was written specifically for you group of drivers because you are not under a union contract"' and '"[w]e want to attract good people and we want to keep good people.""' *Swanson,* at 919.

In February 1986, plaintiff was fired without notice for fighting on company property. *Swanson,* at 920. Plaintiff claimed that he was discharged without notice for a reason other than those for which the company had reserved the right to terminate without notice. *Swanson,* at 920.

On appeal, the court relied on *Thompson* but held as a matter of law that the work rights provision in the memorandum of working conditions promised specific treatment in specific situations. *Swanson,* at 921. The court then indicated that viewing the evidence and the reasonable inferences therefrom in the light most favorable to the plaintiff, there was a material issue of fact as to whether plaintiff justifiably relied on the promises of specific treatment in specific situations. *Swanson,* at 922. The summary judgment was reversed and the case remanded. *Swanson,* at 923.

It is well established that the appropriate standard of review for an order of summary judgment requires this court to undertake the same inquiry as the trial court and determine whether the materials submitted demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985). We must view the materials submitted and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

Some confusion has been engendered as of late regarding how to apply this standard to wrongful discharge cases like the one at bar. As noted earlier in this dissent, *Thompson, Brady* and *Adler* state that the questions of whether a promise has been created and whether that promise has been justifiably relied upon are questions of material fact for the jury. *Thompson,* at 233; *Brady,* at 775; *Adler,* at 37. The courts in *Stewart* and *Swanson,* however, indicate that the question of whether a promise has been created is a matter of law for the court while the question of reliance is a question of fact for the jury. *Stewart,* at 614–15; *Swanson,* at 921.

It is my opinion that the *Stewart* and *Swanson* courts took out of context the references to an implied contract found in *Thompson* and proceeded to consider only a strict contract analysis. I believe that on subsequent analysis the Supreme Court should return to the road charted by *Thompson,* and not seek to require a contract or even an implied contract in at–will employment cases, but rather leave to the judge or jury the material issues of fact. As stated by a unanimous court in *Thompson*:

> whether any statements [in the manual] amounted to promises of specific treatment in specific situations; if so, whether the appellant justifiably relied on any of those promises; and finally, whether any promises of specific treatment were breached. These questions present material issues of fact.

*Thompson,* at 233.[2]

---

[2]At least one writer has opined that the problems inherent with at–will employment would be best dealt with by the legislative branch. Comment, *Employment at Will: Just Cause Protection Through Mandatory Arbitration,* 62 Wash. L. Rev. 151 (1987).